**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| Plaintiff, |
| v. |
| NGOZI POLE, |
| Defendant. |

Crim. Action No. 09-354 (EGS)

**MEMORANDUM OPINION**

**I.  Introduction**

On February 1, 2011, Defendant Ngozi Pole ("Mr. Pole") was convicted by jury of five counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of theft of government property worth more than $1,000 in violation of 18 U.S.C. § 641. *See* Verdict Form, ECF No. 54 at 1-3.[1] He was sentenced to twenty months incarceration and ordered to pay $75,042.37 in restitution. *See* J., ECF No. 102 at 2, 5. Mr. Pole appealed, and on December 20, 2013, the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") remanded various claims of ineffective assistance of trial counsel, as well as the Court's restitution order, for further proceedings. *See United States v.*

---

[1] When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF header page number, not the original page number of the filed document.

1

*Pole*, 741 F.3d 120, 123, 129 (D.C. Cir. 2013). Following the D.C. Circuit's decision, Mr. Pole filed a motion for a new trial, alleging that his trial counsel committed several errors that "either individually or collectively" require a new trial. *See* Def.'s Mot., ECF No. 139 at 3.

While this motion was pending, the Court settled a series of disputes between the parties regarding the proper scope of an evidentiary hearing on Mr. Pole's motion, *see United States v. Pole*, No. 09-354, 2021 WL 5796518 (D.D.C. Dec. 7, 2021);[2] and it then referred the matter to Magistrate Judge Zia M. Faruqui for a hearing and recommendation for the disposition of Mr. Pole's motion, *see* Min. Order (Dec. 21, 2021). Magistrate Judge Faruqui issued a Report and Recommendation ("R. & R."), recommending that the Court deny Mr. Pole's motion for a new trial based on ineffective assistance of counsel. *See* R. & R., ECF No. 193 at 1. Mr. Pole raises several objections to the R. & R. *See* Def.'s Objs. to R. & R. ("Def.'s Objs."), ECF No. 195.

Upon careful consideration of Mr. Pole's pending motion, the R. & R., the objections and response thereto, the applicable law, and the entire record herein, the Court hereby **ADOPTS IN PART** Magistrate Judge Faruqui's R. & R., *see* ECF No. 193; and **DENIES** Mr. Pole's Motion for a New Trial, *see* ECF No. 139.

---

[2] The Court's Memorandum Opinion and Order, dated December 7, 2021, is docketed at ECF No. 182.

## II.  Background[3]

### A. Factual Background

From 1998 to 2007, Mr. Pole served as Senator Edward M. Kennedy's ("Senator Kennedy") Washington, D.C. office manager. *Pole*, 741 F.3d at 123. During that time, he served under four chiefs of staff: (1) Gerard Kavanaugh ("Mr. Kavanaugh"); (2) Mary Beth Cahill ("Ms. Cahill"); (3) Danica Petroshius ("Ms. Petroshius"); and (4) Eric Mogilnicki ("Mr. Mogilnicki")—and one interim chief of staff, Michael Myers ("Mr. Myers"). *Id.*

As office manager, Mr. Pole was responsible for submitting "payroll action authorization" forms ("PAAs"), "which raised or lowered the salaries of office employees." *Id.* "According to the government, [Mr.] Pole needed approval from [Senator] Kennedy or the chief of staff for any salary adjustments, but neither the Senator nor the chiefs of staff regularly reviewed PAAs prior to submission." *Id.*; *see also* R. & R., ECF No. 193 at 1-2 ("[T]he ultimate authority to approve said raises and bonuses belonged to the chief of staff, superseded only by the Senator.").

Mr. Pole was also responsible for maintaining current information on the office's budget, including projected expenses and projected surpluses or deficits, and serving as the office's

---

[3] This Background section closely tracks the factual sections in the R. & R., *see* ECF No. 193 at 1-6; and in the D.C. Circuit's opinion deciding Mr. Pole's appeal, *see United States v. Pole*, 741 F.3d 120, 123-24 (D.C. Cir. 2013).

point of contact for the Senate Disbursing Office, "which sent periodic updates about how much money the office had left to spend." *Pole*, 741 F.3d at 123. "Because Senator Kennedy wanted the office to spend every last cent every fiscal year, [Mr.] Pole was responsible for . . . making recommendations about how to reach the magic zero-balance point." *Id.*

Because of a surplus at the end of fiscal year 2002, Mr. Pole devised a plan for spending down the budget by awarding annual bonuses to himself and other staffers, even though it was against Senate rules. *See* R. & R., ECF No. 193 at 2 (citing U.S. Senate Rule 41). "His plan took advantage of a Kennedy office practice, condoned by the Senator and chiefs of staff," to award annual employee bonuses and exit bonuses, notwithstanding the official Senate ban, so long as the Senator or the chief of staff gave approval. *Pole*, 741 F.3d at 123. However, using his role in the PAA submission process, Mr. Pole granted himself and others various "bonuses that neither the Senator nor the chief of staff authorized." *Id.* at 124. Mr. Pole continued this practice of awarding bonuses until January 2007, when he gave himself an exit bonus before leaving to take a new position as Senator Sherrod Brown's deputy chief of staff. *Id.* In total, Mr. Pole "awarded himself $77,608.86 in unapproved bonuses." *Id.*

Mr. Pole casually mentioned his exit bonus to Mr. Mogilnicki, the Senator's then chief of staff, which led Mr.

Mogilnicki to review payroll records for all employees. *Id.* Upon
"[r]ealizing the extent of [Mr.] Pole's scheme," he contacted
Gregory Craig ("Mr. Craig"), the Senator's former senior aide
and counselor, and together they confronted Mr. Pole on January
26, 2007. *Id.*; *see* Trial Tr. (Jan. 19, 2011), ECF No. 82 at
95:25-96:9. Mr. Craig testified that during this confrontation,
Mr. Pole defended his actions by claiming that he was "entitled"
to the salary raises and that he could have earned more money
working in the private sector. *Pole*, 741 F.3d at 124 (citing
Trial Tr. (Jan. 25, 2011), ECF No. 86 at 58:1-20 (testimony of
Mr. Craig)). Towards the end of this interaction, Mr. Mogilnicki
testified that Mr. Pole offered to pay the money back and that
he said: "If that's what it takes to, you know, to get this
behind me, I'll see if I can -- if I can pay the money back."
Trial Tr. (Jan. 19, 2011), ECF No. 82 at 104:6-9. Ultimately,
Mr. Craig and Mr. Mogilnicki referred the matter to the FBI, and
Senator Brown dismissed Mr. Pole. *Pole*, 741 F.3d at 124.

### B. Procedural Background

Following the FBI investigation, Mr. Pole was charged with
five counts of wire fraud in violation of 18 U.S.C. § 1343 and
one count of theft of government property worth more than $1,000
in violation of 18 U.S.C. § 641. *See* Indictment, ECF No. 1 at 2-
12. During Mr. Pole's ten-day jury trial in January 2011, during
which Rudolph Acree ("Mr. Acree") served as his trial counsel,

*see* Notice of Attorney Appearance, ECF No. 2 at 1; "the basic dispute was over whether [Mr.] Pole knew he needed authorization to award bonuses[,]" *Pole*, 741 F.3d at 124. Because of "Senator Kennedy's instruction to spend the budget to zero and the absence of clear rules and procedures, [Mr.] Pole maintained that he had implicit authority to spend down the budget however he saw fit." *Id.*; *see also* R. & R., ECF No. 193 at 4 (explaining that the basis for Mr. Pole's claimed authority to issue the bonuses without prior approval stemmed from "past practice" and because "he received little input from his bosses on how exactly to spend down the budget").

The government contested this account and used Mr. Pole's own statements and testimony from all four chiefs of staff indicating both that Mr. Pole "knew that he needed approval for salary adjustments" and that none of the chiefs of staff had ever authorized Mr. Pole to make the bonus payments he awarded himself.[4] *Pole*, 741 F.3d at 124; R. & R., ECF No. 193 at 4. In defense, Mr. Acree cross-examined the government's various witnesses, argued objections, and presented testimony from six witnesses, including Mr. Pole, who testified in his own defense. *See* R. & R., ECF No. 193 at 4-5; Trial Tr. (Jan. 26, 2011), ECF

---

[4] Michael Myers, who served as Senator Kennedy's interim chief of staff for three months, also testified but did not offer testimony about Mr. Pole's authority to award bonuses. Gov't's Opp'n, ECF No. 142 at 1 n.1.

No. 87 at 3:1-10. Mr. Acree's "main defense was that Mr. Pole believed he had the authority to spend the budget down to zero"—in other words that he had acted in good faith and had not intended to defraud or steal from the government. *See* R. & R., ECF No. 193 at 5-6; Def.'s Objs., ECF No. 195 at 8.

Ultimately, the jury convicted Mr. Pole on all five counts of wire fraud and on the one count of theft of government property. *See* Verdict Form, ECF No. 54 at 1-3. The Court then sentenced Mr. Pole to twenty months in prison, followed by three years of supervised release, and ordered him to pay $75,042.37 in restitution—the full amount of money the government alleged he stole in unapproved bonuses to himself, $77,608.86, minus $2,566.49 that Mr. Mogilnicki managed to recover through the Senate Disbursing Office. *See* J., ECF No. 102 at 2-3, 5; *Pole*, 741 F.3d at 124, 127. Mr. Pole began serving his sentence on July 27, 2012, *see* Second Consent Mot. to Modify Conditions of Release to Allow Travel, ECF No. 111 at 1; and on April 19, 2016, the Court granted his motion for early termination of supervised release, *see* Min. Entry (Apr. 19, 2016).

Mr. Pole appealed his conviction, challenging three evidentiary rulings and arguing that he received ineffective assistance of counsel and that the Court miscalculated restitution. *Pole*, 741 F.3d at 124. The specific ineffective assistance of counsel claims Mr. Pole raised on appeal were:

that [his] trial counsel should have (1) produced unredacted copies of [Mr.] Pole's budget memos; (2) 'through documentary evidence and additional discovery or otherwise' demonstrated that '[Mr.] Pole routinely issued exit bonuses without specific chief of staff approval'; (3) 'demonstrate[d] that [Mary Beth] Cahill instructed [Mr.] Pole to spend the budget to zero, or to impeach her testimony that she did not do so'; and (4) attempted to impeach [Danica] Petroshius by introducing evidence about employee bonuses she denied issuing and by 'question[ing] [Ms.] Petroshius regarding a memoranda from [Mr.] Pole' containing budgetary information she claimed never to have received.

*Id.* at 126 (citation omitted). On December 20, 2013, the D.C. Circuit rejected Mr. Pole's evidentiary challenges and remanded his ineffective assistance claims. *Id.* at 129. As to the restitution order, the D.C. Circuit concluded that this Court's factual findings about the duration of Mr. Pole's scheme to defraud were insufficient to support the restitution amount, and it vacated and remanded "the restitution order for further proceedings consistent with [its] opinion." *See id.* at 127-29.

On May 4, 2015, Mr. Pole filed a motion for a new trial, in which he raised the ineffective assistance of counsel claims that were remanded by the D.C. Circuit, as well as several new ineffectiveness claims. *See* Def.'s Mot., ECF No. 139. The ineffective assistance claims asserted for the first time in this motion are that trial counsel: (1) should have presented a good faith defense but did not; (2) failed to object to the

admission of Mr. Mogilnicki's testimony regarding Mr. Pole's offer to repay the unapproved bonuses, thereby neglecting to properly consider Federal Rule of Evidence 408 governing compromise offers and negotiations; (3) failed to object to the admission and use of Mr. Pole's oath of office in the government's closing argument; (4) failed to call James McCarthy ("Mr. McCarthy"), who was issued a bonus by Mr. Pole, to testify that he did not consider Mr. Pole a friend, thereby disproving the government's "central" argument at trial that Mr. Pole only awarded bonuses to himself and office friends; and (5) failed to call Kathleen Kruse ("Ms. Kruse"), who was also issued a bonus by Mr. Pole, to testify that she informed Ms. Petroshius of the bonus she received, thereby impeaching Ms. Petroshius' testimony on the issue of whether she knew about high year-end bonuses. *See id.* at 2-3, 16-24; *see also* R. & R., ECF No. 193 at 6 (explaining that most of Mr. Pole's ineffective assistance of counsel claims allege "that Mr. Acree failed to object to testimony, introduce evidence, or impeach" witnesses).

The government filed its opposition to Mr. Pole's motion for a new trial on June 15, 2015, *see* Gov't's Opp'n, ECF No. 142; and Mr. Pole filed his reply on August 3, 2015, *see* Def.'s Reply, ECF No. 144. The Court ordered an evidentiary hearing on Mr. Pole's motion "[i]n the interest of having the most complete record upon which to render its decision," *see* Min. Order (Apr.

18, 2017); Min. Order (May 26, 2017) (setting the evidentiary
hearing for November 14, 2017); but due to various disputes
between the parties regarding the proper scope of the hearing
and the extent of the Court's authority to rule on some of Mr.
Pole's claims, *see, e.g.*, Joint Status Report, ECF No. 176 at 1-
7; and to allow the Court time to resolve those disputes, the
evidentiary hearing was vacated, *see* Min. Order (Nov. 12, 2017).
Thereafter, on January 16, 2018, Mr. Pole filed a supplement to
his motion for a new trial based on allegedly newly discovered
evidence of prosecutorial misconduct. *See* Def.'s Suppl. Mot. New
Trial, ECF No. 168. He simultaneously filed a petition for a
writ of *coram nobis* "on the grounds that he received
constitutionally ineffective assistance of counsel in violation
of the Sixth Amendment and/or that the government committed
prosecutorial misconduct before and during [his] trial." *See*
Def.'s Pet. Writ *Coram Nobis*, ECF No. 169 at 1.

On December 7, 2021, the Court concluded that it could
"consider the entirety of Mr. Pole's motion for a new trial
during the upcoming evidentiary hearing, but [that] it [could]
not consider the contents of Mr. Pole's supplement as it was
untimely filed." *Pole*, 2021 WL 5796518, at *1, *11. The Court
also denied Mr. Pole's petition for a writ of *coram nobis*. *Id.*;
*see* Order, ECF No. 181 at 1. The Court then referred the matter
to Magistrate Judge Faruqui to conduct an evidentiary hearing

and issue a recommendation regarding the disposition of Mr. Pole's motion for a new trial. *See* Min. Order (Dec. 21, 2021).

On April 7, 2022, Magistrate Judge Faruqui conducted the evidentiary hearing, during which Mr. Acree testified about his trial representation of Mr. Pole, including his "strategic reasons for objecting (or not) to testimony, introducing (or not) evidence, and impeaching (or not) a witness." R.& R., ECF No. 193 at 6; *see* Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 24:22-88:23. During the hearing, Mr. Acree explained his objection strategy, noting that "there are definitely times" when he could but would not object in a trial, for example when doing so would "highlight a piece of evidence for the jury that would be problematic" or would "make [him] seem afraid of" a piece of evidence, and if the evidence in question would be "helpful" and "not harmful" to the defense. *See* Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 52:20-53:23. He further explained that his "strategy" or "philosophy" "at any trial" entails not necessarily "trying to get [his] objections right or wrong," but reacting in ways that will "help [him] win[.]" *Id.* at 54:6-18. Additionally, Mr. Acree "testified that he had an open line of communication with Mr. Pole" and always discussed strategy and major decisions with him. R.& R., ECF No. 193 at 6 (citing Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 43-48).

Following the evidentiary hearing, the parties submitted their proposed findings of fact and conclusions of law. *See* ECF Nos. 189 & 190. On September 9, 2022, Magistrate Judge Faruqui recommended that the Court deny Mr. Pole's motion for a new trial based on ineffective assistance of counsel. *See* R. & R., ECF No. 193 at 1, 26. On November 22, 2022, Mr. Pole submitted his objections to the R. & R., *see* Def.'s Objs., ECF No. 195; to which the government responded on December 2, 2022, *see* Gov't's Resp., ECF No. 196. Mr. Pole's objections are now ripe and ready for the Court's adjudication.

**III. Standard of Review**

    **A. Objections to a Magistrate Judge's Report and Recommendation**

Pursuant to Federal Rule of Civil Procedure 72(b), a party may file specific written objections once a magistrate judge has entered a recommended disposition. *See* Fed. R. Civ. P. 72(b)(1)-(2). A district court "may accept, reject or modify the recommended disposition[.]" Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."). A district court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3). "If, however, the party makes only conclusory or

general objections, or simply reiterates his original arguments,
the [c]ourt reviews the [R. & R.] only for clear error."
*Houlahan v. Brown*, 979 F. Supp. 2d 86, 88 (D.D.C. 2013)
(citation and internal quotation marks omitted). "Under the
clearly erroneous standard, the magistrate judge's decision is
entitled to great deference and is clearly erroneous only if on
the entire evidence the court is left with the definite and firm
conviction that a mistake has been committed." *Buie v. Dist. of
Columbia*, No. 16-1920, 2019 WL 4345712, at *3 (D.D.C. Sept. 12,
2019) (citing *Graham v. Mukasey*, 608 F. Supp. 2d 50, 52 (D.D.C.
2009) (internal quotation marks omitted)).

Objections must "specifically identify the portions of the
proposed findings and recommendations to which objection is made
and the basis for objection." LCvR 72.3(b). "[O]bjections which
merely rehash an argument presented [to] and considered by the
magistrate judge are not 'properly objected to' and are
therefore not entitled to de novo review." *Shurtleff v. EPA*, 991
F. Supp. 2d 1, 8 (D.D.C. 2013) (citation omitted).

## B. Motion for a New Trial Based on Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution
guarantees criminal defendants the right to effective assistance
of counsel. *See* U.S. Const. amend. VI. Claims of ineffective
assistance of counsel are governed by a two-step standard set

forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct.
2052, 80 L. Ed. 2d 674 (1984). To succeed, a defendant must show
both deficient performance by his attorney and prejudice to the
trial outcome. *Strickland*, 466 U.S. at 687. *Strickland* requires
a party claiming ineffective assistance of counsel to show that:
(1) "counsel's representation fell below an objective standard
of reasonableness . . . [measured] under prevailing professional
norms[,]" (the performance prong); and (2) the "deficiencies in
counsel's performance [were] prejudicial to the defense" (the
prejudice prong). *Id.* at 688, 692.

　　　To establish deficient performance, the defendant "must
identify the acts or omissions of counsel that are alleged not
to have been the result of reasonable professional judgment."
*Id.* at 690; *see also United States v. Cronic*, 466 U.S. 648, 666,
104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) (requiring defendants
to "point[] to specific errors made by trial counsel"). To
establish prejudice, the defendant must show "a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different." *Strickland*,
466 U.S. at 694. The defendant thus bears the burden of proof as
to both prongs, and a "[f]ailure to make the required showing of
either deficient performance or sufficient prejudice defeats the
ineffectiveness claim." *Id.* at 687, 700. Furthermore, in
deciding such a claim, courts need not "approach the inquiry in

the same order" or "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

"Judicial scrutiny of counsel's performance must be highly deferential[,]" and the defendant must overcome "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 100 L. Ed. 83 (1955)). "[E]very effort" must therefore "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time[,]" as the "benchmark" for a successful ineffective assistance of counsel claim is that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 689. Ultimately, "[u]nder established law, it is very difficult for a convicted defendant to prevail on a claim of ineffective assistance of counsel[.]" *United States v. Moore*, 703 F.3d 562, 574 (D.C. Cir. 2012).

## IV.  Analysis

Mr. Pole advances nine ineffective assistance of trial counsel claims, four of which were remanded by the D.C. Circuit,

*see Pole*, 741 F.3d at 126; and five of which were raised for the first time in his motion for a new trial before the Court, *see* Def.'s Mot., ECF No. 139 at 2-3, 16-24. Mr. Pole argues in his motion that each of the nine alleged failures by Mr. Acree "standing alone, [are] sufficient to provide [Mr.] Pole with a new trial[,]" and that in addition, their cumulative effect "plainly warrants vacating [Mr.] Pole's conviction." *Id.* at 24.

Magistrate Judge Faruqui rejected all of Mr. Pole's claims and concluded that he did not receive ineffective assistance of counsel. *See* R. & R., ECF No. 193. First, Magistrate Judge Faruqui rejected Mr. Pole's claim that Mr. Acree failed "to present a good faith defense" and "request a good faith jury instruction" because he concluded that "the underpinnings of Mr. Acree's defense was . . . good faith reliance by Mr. Pole[,]" and that the jury instructions adequately explained the concept of good faith. *See id.* at 9-12. Second, Magistrate Judge Faruqui rejected Mr. Pole's claims that Mr. Acree failed to object to or introduce testimony, instead determining that Mr. Acree's failures to object to Mr. Mogilnicki's testimony on Mr. Pole's offer to repay the unapproved bonuses and the government's use of Mr. Pole's oath of office in its closing argument, and his failure to call Mr. McCarthy as a witness, could all be deferred to as strategic, non-prejudicial choices. *See id.* at 12-17. Third, Magistrate Judge Faruqui rejected Mr. Pole's claims that

Mr. Acree's decisions not to impeach the testimony of Ms. Cahill
and Ms. Petroshius, including by calling Ms. Kruse to testify
for the purpose of impeaching Ms. Petroshius, were ineffective
because he concluded that choosing not to impeach or call
certain witnesses is "sound trial strategy" rather than
prejudicial or deficient performance. *See id.* at 17-20. Lastly,
Magistrate Judge Faruqui rejected Mr. Pole's claims that Mr.
Acree was ineffective for not using and introducing into
evidence unredacted copies of Mr. Pole's budget memoranda and
employment history transcripts, allegedly showing that Mr. Pole
"routinely issued exit bonuses without specific chief of staff
approval," because he determined that these decisions were non-
prejudicial and "sound trial strategy." *See id.* at 20-24.

Mr. Pole "objects to each of the R. & R.'s conclusions" and
claims that the R. & R. is most critically erroneous with regard
to: (1) its findings that Mr. Acree's "failures to make certain
objections were 'strategic[;]'" (2) its failure "to grasp the
central issue at trial, which [was] whether Mr. Pole believed he
needed approval from his bosses to issue bonuses" in an effort
to spend down the budget, specifically exhibited by its improper
conclusion that Mr. Pole was not prejudiced by Mr. Acree's
failure to use and introduce into evidence unredacted budget
memoranda and employment transcripts; and (3) its failure to
consider the cumulative effect of Mr. Acree's alleged errors at

17

trial. Def.'s Objs., ECF No. 195 at 21-22. Mr. Pole also takes issue with the R. & R.'s recommendation that this Court's original $75,042.37 restitution order be confirmed. *Compare* R. & R., ECF No. 193 at 24-26, *with* Def.'s Objs., ECF No. 195 at 45-46. The government responds that Mr. Pole's objections "are simple regurgitations of arguments he has already made and fail to accurately consider the trial record and Mr. Acree's credible testimony at the April [7], 2022 evidentiary hearing." Gov't's Resp., ECF No. 196 at 1. The Court first addresses in turn Mr. Pole's various objections to Magistrate Judge Faruqui's conclusions as to Mr. Acree's trial performance before turning to Mr. Pole's objection to Magistrate Judge Faruqui's conclusion as to the proper restitution amount.

### A. Magistrate Judge Faruqui Did Not Err in His Conclusion That Mr. Pole Did Not Receive Ineffective Assistance of Counsel

#### 1. Mr. Acree Was Not Ineffective for Not Lodging Certain Objections During Trial

The Court first addresses Mr. Pole's objections to Magistrate Judge Faruqui's conclusion that Mr. Acree's failures to lodge certain objections during trial, specifically to: (1) the admission of Mr. Mogilnicki's testimony on Mr. Pole's offer to repay the unapproved bonuses; and (2) the government's use of Mr. Pole's oath of office during its closing argument, were "strategic" decisions entitled to deference under *Strickland*.

18

Def.'s Objs., ECF No. 195 at 22. He argues that the R. & R.
ignores evidence that these failures were not "decisions"
because Mr. Acree stated in a sworn declaration and testified
during the evidentiary hearing that he did not realize he had a
legal basis to make those objections. *Id.* at 22, 24, 27. As a
result, Mr. Pole argues that "[t]rial counsel could not possibly
have 'deci[ded]' not to lodge an objection of which he was
completely unaware[,]" and that even if these errors could be
considered "strategic," they were "objectively unreasonable."
*Id.* at 22. The government responds that Magistrate Judge
Faruqui's labeling of these alleged failures as "strategic
decisions" was correct and consistent with the trial record and
Mr. Acree's testimony. Gov't's Resp., ECF No. 196 at 2. Because
the Court agrees with Mr. Pole that the R. & R. does not
consider Mr. Acree's sworn declaration where he admitted that he
"had no strategic reason for not objecting to Mr. Mogilnicki's
testimony regarding Mr. Pole's offer to [re]pay the money" or
"to the government's use of" his oath of office in its closing
argument, *see* Def.'s Hearing Ex. 220, ECF No. 186-1 at 10-12 ¶¶
7, 10-11 (admitted into evidence during the April 7, 2022
evidentiary hearing); the Court reviews de novo these two
objections.

"Criminal defendants do not have a right to perfect
assistance of counsel, but to 'reasonably effective

assistance.'" *United States v. Gibson*, 577 F. Supp. 2d 317, 324
(D.D.C. 2008) (quoting *Strickland*, 466 U.S. at 687). "There are
countless ways to provide effective assistance in any given
case[,]" and "[e]ven the best criminal defense attorneys would
not defend a particular client in the same way." *Strickland*, 466
U.S. at 689. Therefore, trial counsel's "strategic decisions . .
. are entitled to a 'strong presumption' of reasonableness[,]"
especially since "[d]efense lawyers have 'limited' time and
resources, and so must choose from among 'countless' strategic
options." *Dunn v. Reeves*, 594 U.S. 731, 739, 141 S. Ct. 2405,
210 L. Ed. 2d 812 (2021) (quoting *Harrington v. Richter*, 562
U.S. 86, 104, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (some
internal quotation marks omitted)). As a result, strategic
decisions can be "particularly difficult because certain tactics
carry the risk of 'harm[ing] the defense' by undermining
credibility with the jury or distracting from more important
issues." *Id.* (quoting *Harrington*, 562 U.S. at 108).

Although the strategic choices of a defendant's counsel are
presumed to be "sound trial strategy" absent the defendant
successfully rebutting this presumption, *id.*; *Strickland*, 466
U.S. at 689; "'strategic choices made after less than complete
investigation are reasonable' only to the extent that
'reasonable professional judgments support the limitations on
investigation[,]'" *Wiggins v. Smith*, 539 U.S. 510, 512, 123 S.

Ct. 2527, 156 L. Ed. 2d 471 (2003) (quoting *Strickland*, 466 U.S. at 690-91). However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690. As such, "even if there is reason to think that counsel's conduct 'was far from exemplary,' a court may still not grant relief if '[t]he record does not reveal' that counsel took an approach that no competent lawyer would have chosen." *Dunn*, 594 U.S. at 739 (quoting *Burt v. Titlow*, 571 U.S. 12, 23-24, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013)).

### a. Mr. Mogilnicki's Testimony Regarding Mr. Pole's Offer to Repay the Unapproved Bonuses

Mr. Pole's first objection centers on testimony from Mr. Mogilnicki, the final chief of staff under whom Mr. Pole worked and the government's first witness in its case-in-chief. *See* Trial Tr. (Jan. 19, 2011), ECF No. 82 at 7:2-23. Mr. Mogilnicki testified about the January 26, 2007 meeting in which he confronted Mr. Pole following his discovery of the unapproved bonuses scheme. *See id.* at 92:9-96:9. Mr. Mogilnicki also asked Mr. Craig, "a former Kennedy staffer[ and] a very experienced and skilled lawyer," to attend the meeting as "reinforcements," *i.e.*, "a lawyer to ask for . . . an independent view of what was happening here." *Id.* at 93:3-4, 95:7-11. During his testimony, Mr. Mogilnicki recounted the various reasons Mr. Pole gave to

try to explain discrepancies between spreadsheets he had created detailing bonus/salary amounts and the Senate Disbursing Office's account of the amount of money he was actually paid. *See id.* at 96:15-19, 97:20-98:14, 101:6-17. One explanation Mr. Pole gave was that "he had been told by prior chiefs of staff that the Senator wanted to get to zero on the budget, so if there was extra money, he should just spread it around." *Id.* at 98:11-14. According to Mr. Mogilnicki, Mr. Pole also explained that he felt "entitled" to the money because he was "underpaid" and his previous requests for raises were rejected. *Id.* at 101:18-102:2. Additionally, Mr. Mogilnicki testified that "[t]here came a time in that conversation when [Mr. Pole] offered to try to pay the money back. He said, 'If that's what it takes to, you know, to get this behind me, I'll see if I can . . . pay the money back." *Id.* at 104:6-9. When asked what his "understanding" of that offer was and what he took it "to mean," Mr. Mogilnicki testified:

> You know, that was when I lost my last hope
> that this wasn't what it seemed to be. I --
> you know, I went to the meeting thinking maybe
> there was an explanation, but that sort of --
> that was the -- that was sort of the last straw
> in my mind as to whether he had actually taken
> the money or not. I couldn't imagine someone
> who had an honest right to that money would
> offer to pay it back. That didn't make sense.

*Id.* at 104:17-105:2. Mr. Pole argues that Mr. Acree's failure to object to Mogilnicki's testimony on: (1) Mr. Pole's offer to

22

repay the money, and (2) Mr. Mogilnicki's understanding of that offer, or what Mr. Pole argues was testimony about "*the moment* [Mr. Mogilnicki] became convinced of Mr. Pole's guilt[,]" was ineffective assistance of counsel because Mr. Acree did not properly consider Federal Rule of Evidence 408, which governs the admissibility of evidence pertaining to compromise offers and negotiations. *See* Def.'s Objs., ECF No. 195 at 7-8, 23-27; Def.'s Mot., ECF No. 139 at 16-18.

On remand from the D.C. Circuit, Mr. Pole's post-conviction counsel interviewed Mr. Acree and obtained a declaration from him in which he stated: "I had no strategic reason for not objecting to Mr. Mogilnicki's testimony regarding Mr. Pole's offer to pay the money back under Federal Rule of Evidence 408. I did not consider the applicability of Rule 408 during Mr. Pole's trial." Def.'s Hearing Ex. 220, ECF No. 186-1 at 11 ¶ 7. In addition, during the evidentiary hearing before Magistrate Judge Faruqui, Mr. Acree testified that he did not consider Rule 408 in his analysis of these two contested portions of Mr. Mogilnicki's testimony, and that if he had "know[n] that [Rule 408 is saying that [Mr. Mogilnicki's testimony regarding his understanding of Mr. Pole's repayment offer] doesn't come in," then he "probably would have had that part taken out[.]" *See* Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 86:20-87:21.

However, Mr. Acree also testified that he was not concerned about the admission of Mr. Mogilnicki's testimony on Mr. Pole's offer to repay the money enough to object because he did not think it detrimentally "impact[ed]" his "arguments in the case," *see id.* at 54:19-58:11, 74:5-17, 81:2-12; which focused on positively depicting Mr. Pole's character and his desire "to act in the best interest of the office" rather than "steal money[,]" *id.* at 56:1-2, 22-25. Mr. Acree further testified that from his perspective, Mr. Pole's offer to repay the money "wasn't inconsistent with who he was and how he acted throughout, which is what we were trying to portray." *Id.* at 58:2-4. Instead, Mr. Acree saw Mr. Pole's offer, not with "a negative attached to" it, but rather as demonstrating Mr. Pole's realization that his actions had not aligned with what the office "wanted [him] to do," and that he would try to fix his mistake by repaying the money. *See id.* at 56:22-58:11 ("In that moment, at a minimum, I didn't see it as something that was harmful or problematic."). Mr. Acree also testified that not objecting to this line of testimony aligned with his strategic "philosophy" to "listen" and "respond" to the evidence as he sees "fit, in terms of winning and losing[.]" *Id.* at 58:16-21.

Based on this testimony, Magistrate Judge Faruqui concluded that Mr. Acree's "decision not to object to [Mr. Mogilnicki's] testimony was part of his strategy to show Mr. Pole's good

character[,]" and that although it was "debatable" whether Mr. Pole's offer to repay the money "constituted a settlement negotiation under Rule 408[,]" it was irrelevant "because Mr. Acree made a reasonable strategic decision to admit" the testimony as part of his "sound trial strategy." R. &. R., ECF No. 193 at 13-14. However, the R. & R. did not consider Mr. Acree's sworn declaration admitting that he had "no strategic reason for not objecting to Mr. Mogilnicki's testimony" under Rule 408. Def.'s Hearing Ex. 220, ECF No. 186-1 at 11 ¶ 7. Although Mr. Acree's testimony indicates that there was some strategic reasoning for not objecting to the contested parts of Mr. Mogilnicki's testimony, his declaration clearly indicates that this "strategy" failed to consider Rule 408. As a result, the Court begins its analysis of this ineffective assistance of counsel claim by determining whether Mr. Pole's offer to repay the money was inadmissible under Rule 408.

Federal Rule of Evidence 408 states that evidence of "furnishing, promising, or offering . . . a valuable consideration in compromising or attempting to compromise" a "disputed claim" and "conduct or a statement made during compromise negotiations about [that] claim" are not admissible "either to prove or disprove the validity or amount of [that] disputed claim . . . ." Fed. R. Evid. 408(a). In other words, Rule 408 excludes evidence of compromise offers and negotiations

when the evidence is offered to prove a defendant's "liability" or guilt for a "disputed claim." *See id.* ("Committee Notes on Rules—2006 Amendment"). "Offers to settle are excluded even if no settlement negotiations follow[,]" and since Rule 408 is "meant to promote settlements[,] . . . [i]f one party attempts to initiate negotiations with a settlement offer, the offer is excluded from evidence even if the counterparty responds: 'I'm not negotiating with you.'" *United States v. Davis*, 596 F.3d 852, 859 (D.C. Cir. 2010) (citing Fed. R. Evid. 408 advisory committee's note (1972 proposed rule)), *rehearing en banc denied*, 711 F.3d 174 (D.C. Cir. 2013). In sum, for Rule 408 to apply, "an actual dispute must exist, preferably some negotiations, and at least an apparent difference of view between the parties as to the validity or amount of the claim." McCORMICK ON EVID. § 266 (8th ed.).

In the R. & R., Magistrate Judge Faruqui stated that Mr. Pole's offer to repay the money "may not have been a settlement offer under Rule 408 because Mr. Pole was not negotiating a disputed civil claim when he made the statement, nor was he in plea negotiations with a prosecutor." R. & R., ECF No. 193 at 13 n.3. However, in *United States v. Davis*, 596 F.3d 852 (D.C. Cir. 2010), the D.C. Circuit concluded that "[t]he 2006 amendment to Rule 408 . . . made clear that the rule applie[s] to both civil and criminal proceedings" so as to bar the use of a defendant's

compromise offer and statements in negotiation, except when permissibly used "to prove the defendant's attempt to obstruct a criminal investigation." *Id.* at 860.

Here, Mr. Pole was never charged with obstruction, and at the time of his conversation with Mr. Mogilnicki, "there was no date identifying the beginning of a criminal investigation," or evidence that Mr. Pole "knew of any criminal investigation when he talked to" Mr. Mogilnicki, nor did Mr. Mogilnicki testify that he thought Mr. Pole was trying to "bribe" him with the repayment offer. *See id.* As such, the Court concludes that Mr. Pole's offer "to get this behind" him and "pay the money back," and Mr. Mogilnicki's accompanying testimony that this offer was "the last straw in [his] mind as to whether [Mr. Pole] had actually taken the money or not[,]" Trial Tr. (Jan. 19, 2011), ECF No. 82 at 104:6-9, 20-24; were inadmissible "as evidence of [Mr. Pole's] knowledge of his own guilt, which is to say his 'liability[,]'" *see Davis*, 596 F.3d at 860-61 ("Consciousness of guilt proves 'liability' for a disputed claim under Rule 408(a)."). As Mr. Pole explains, Mr. Mogilnicki's testimony of his understanding of Mr. Pole's repayment offer "was important because it was the moment when he believed Mr. Pole was conscious of guilt, because *he 'couldn't imagine that someone who had an honest right to that money would offer to pay it back*.'" Def.'s Objs., ECF No. 195 at 25 n.1 (emphasis in

original). Rule 408 should therefore have barred the use of this testimony for the purpose of establishing Mr. Pole's guilt.

Mr. Pole directs the Court to the D.C. Circuit's decision in *Davis* to support his argument that Rule 408 should have prohibited Mr. Mogilnicki's testimony on his offer to repay the money, and that Mr. Acree's failure to object was both deficient performance and prejudicial. *See* Def.'s Mot., ECF No. 139 at 17-18; Def.'s Objs., ECF No. 195 at 25-27. Despite "similar" facts, Magistrate Judge Faruqui declared *Davis* inapposite here because of a differing "posture," as *Davis* involved the D.C. Circuit's conclusion that "the district court erroneously allowed testimony of [a] repayment offer over defense counsel's objections." R. & R., ECF No. 193 at 13 n.3. The Court disagrees, instead concluding that *Davis* dictates that Mr. Mogilnicki's contested testimony was prohibited under Rule 408, and that Mr. Acree should have objected to its admission.

In *Davis*, the defendant, Mr. Davis, was accused of stealing over a period of years from the fraternity for which he served as national treasurer. 596 F.3d at 853-54. At trial, the new treasurer of the fraternity, Mr. Hammock, testified about a conversation he had with Mr. Davis in which he confronted Mr. Davis after evidence of his misconduct surfaced. *Id.* at 854, 859. Mr. Davis responded by asking what it would "take to make this go away" and offered to repay a portion of the money he had

stolen from the fraternity. *Id.* at 859. The D.C. Circuit concluded that this was an offer to compromise a claim that "was disputed as to validity or amount," as Mr. Davis did not confess to taking the fraternity's money but rather tried to provide an explanation for his actions, which Mr. Hammock in turn rejected. *Id.* Because the government had sought to introduce Mr. Davis' settlement offer to prove his guilt, contrary to Rule 408's direction, the D.C. Circuit concluded that the district court abused its discretion in permitting Mr. Hammock's testimony over defense counsel's objection, and it vacated his convictions and remanded for further proceedings. *Id.* at 860-61.

Here, Mr. Pole similarly offered to repay the unapproved bonuses to put the situation "behind" him, but he never confessed to stealing the money and tried to provide Mr. Mogilnicki with explanations for the discrepancies in the salary and bonus spreadsheet numbers, which Mr. Mogilnicki ultimately rejected. *See* Trial Tr. (Jan. 19, 2011), ECF No. 82 at 104:6-9, 105:3-8. The "validity" of the claim was therefore "disputed" at the time Mr. Pole made his repayment offer, especially since Mr. Mogilnicki ensured that a lawyer, Mr. Craig, attended the meeting as legal "reinforcements," and thereafter suspended Mr. Pole, taking away his key and remote access to his computer. *Id.* at 104:10-16; *see, e.g.*, *Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 965 (8th Cir. 2011) (stating that "a dispute need not

'crystallize to the point of threatened litigation' for the 408
exclusion rule to apply . . . so long as there is an 'actual
dispute or difference of opinion' regarding a party's liability
for or the amount of the claim," which was evidenced by the
employee being placed on administrative leave and offered a
separation agreement). As a result, introducing Mr. Pole's offer
as evidence of his guilt was prohibited by Rule 408.

Thus, although the "posture" of this case is different from
*Davis* because Mr. Acree never objected to the now contested
parts of Mr. Mogilnicki's testimony, *Davis* dictates that Mr.
Acree "performed deficiently in failing to challenge [compromise
offer] testimony by [Mr. Mogilnicki] that violated Rule [408]."
*United States v. Glover*, 872 F.3d 625, 633 (D.C. Cir. 2017). The
"requirement[s] of Rule [408] on which the objection[]" should
have been based were "clear," and therefore, Mr. Acree "was
deficient for not raising the issue," or at a minimum
considering it. *Id.* at 634. As Mr. Acree has stated, he "did not
consider the applicability of Rule 408 during Mr. Pole's
trial[,]" Def.'s Hearing Ex. 220, ECF No. 186-1 at 11 ¶ 7; and
had he known the parameters of Rule 408, he "probably would have
had" parts of Mr. Mogilnicki's testimony "taken out" from the
record, Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 87:17-21. The
Court therefore disagrees that "it does not matter if Mr. Pole's
offer was protected by Rule 408" because Mr. Acree has admitted

that his "strategic" thinking on this testimony did not extend
to considering the requirements of this applicable evidentiary
rule. R. & R., ECF No. 193 at 13 n.3; *see also* Def.'s Objs., ECF
No. 195 at 26 n.3 (contending that the R. & R. "mischaracterizes
the record, since trial counsel never testified that he had
'several reasons' not to object [to Mr. Mogilnicki's testimony]—
the reason was that he just did not consider Rule 408").

Accordingly, the Court concludes that objectively
reasonable trial counsel assistance "under prevailing
professional norms[,]" *Strickland*, 466 U.S. at 687-88; requires
familiarity with and consideration of the Federal Rules of
Evidence, and Mr. Acree's failure to consider a relevant rule
constituted deficient performance, *see, e.g.*, *United States v.
Soto*, 132 F.3d 56, 59 (D.C. Cir. 1997) (requiring defense
counsel to have "familiarity" with the structure and content of
the federal Sentencing Guidelines and concluding that ignorance
of a relevant Guideline provision can amount to ineffective
assistance of counsel); *United States v. Carthorne*, 878 F.3d
458, 469 (4th Cir. 2017) (concluding that "counsel's failure [ ]
to demonstrate a grasp of the relevant legal standards" can
amount to deficient performance).

Having concluded that Mr. Acree "performed below the
constitutional standard" in failing to consider Rule 408 when
deciding whether to object to the contested portions of Mr.

Mogilnicki's testimony, the Court next considers whether Mr.
Pole was "prejudiced by this deficiency." *Glover*, 872 F.3d at
634. Mr. Pole argues that "[i]t defies belief that the jury
would not have been swayed by Mr. Mogilnicki's testimony" on Mr.
Pole's repayment offer and his impressions of the "significance"
of that offer, and that the admission of this testimony was
therefore "extremely prejudicial." Def.'s Objs., ECF No. 195 at
26; Def.'s Mot., ECF No. 139 at 18. The government responds that
Mr. Pole's "offer of repayment pales in comparison to the
overwhelming evidence of [his] guilt before the jury[,]" and
that "when considered alongside all the evidence, [Mr.] Pole's
statement that he could pay the money back could not have
affected the jury's verdict." Gov't's Opp'n, ECF No. 142 at 16.
The R. & R. does not address *Strickland*'s prejudice prong in its
analysis of this ineffective assistance of counsel claim, so the
Court does so for the first time here.

Based on Mr. Mogilnicki's remaining permissible testimony,
in addition to the strength of the testimony from Senator
Kennedy's other chiefs of staff all "indicating that [Mr.] Pole
knew that he needed approval for salary adjustments[,]" *Pole*,
741 F.3d at 124; the Court concludes that the jury would have
convicted Mr. Pole "even absent the problematic testimony by"
Mr. Mogilnicki, *Glover*, 872 F.3d at 634. Specifically, Mr.
Mogilnicki testified that "it was clear from [his] conversation

[with Mr. Pole] that he didn't have authorization to make"
changes related to the awarding of bonuses and that it "was
clear that [Mr. Pole] had . . . done what he felt like doing."
Trial Tr. (Jan. 19, 2011), ECF No. 82 at 105:3-8. Mr. Mogilnicki
further testified that neither he nor Senator Kennedy authorized
Mr. Pole to award himself bonuses and that what Mr. Pole did
"was so incredibly inconsistent with the work [they had] done
together to get these bonuses just right that it was . . . clear
to [him] that this was . . . something [Mr. Pole] did on his
own[,]" as opposed to something he had claimed the implicit or
explicit "right" to do. *Id.* at 105:9-106:12. In addition, Ms.
Petroshius testified that while she was chief of staff, Mr. Pole
never had authority to authorize bonuses. Trial Tr. (Jan. 24,
2011), ECF No. 85 at 5:2-7, 40:14-25. She stated that she had no
reason to believe that Mr. Pole did not understand his role at
the office or that only the Senator and chiefs of staff could
approve bonuses, as she never told Mr. Pole to spend around the
budget surplus without talking to her first. *Id.* at 41:22-42:19,
93:12-17. Likewise, Ms. Cahill testified that when she was chief
of staff, she also never told Mr. Pole that he had authority to
spend down the budget on his own. Trial Tr. (Jan. 21, 2011), ECF
No. 84 at 47:16-21. All of this testimony regarding what Mr.
Pole calls "the fundamental issue"—whether he could have
reasonably believed he had authority to spend down the budget by

awarding bonuses without authorization, Def.'s Objs., ECF No. 195 at 8; was provided separately from Mr. Mogilnicki's testimony on Mr. Pole's offer to repay the money, *see* Trial Tr. (Jan. 31, 2011), ECF No. 121 at 18:1-4 (noting in the government's closing that Mr. Pole "repeated [the] claim that he was just spending down the budget" but later "admitted that no one ever told him to pay bonuses out on his own").

That Mr. Mogilnicki had "sterling credentials" and was one of the government's main witnesses, *see* Def.'s Objs., ECF No. 195 at 26; does not negate "the quantity of evidence" that existed independently of his inadmissible testimony, *Glover*, 872 F.3d at 635; *see* Gov't's Opp'n, ECF No. 142 at 10-12 (summarizing "the overwhelming evidence" that Mr. Pole "knew that he did not have authority to award bonuses without approval from [a] [c]hief of [s]taff[,]" which includes Mr. Pole's "own statements" in "extensive correspondence" such as emails and memoranda to the chiefs of staff). In addition, the Court is not persuaded by Mr. Pole's argument that the harm here is "greater than it was in *Davis*," Def.'s Objs., ECF No. 195 at 26; as the D.C. Circuit in *Davis* declined to assess, *sua sponte*, whether the error to admit Mr. Davis' compromise offer over trial counsel's objection was "harmless," 596 F.3d at 861.

Thus, although the jury may have been "swayed" to some degree by Mr. Mogilnicki's testimony, Def.'s Objs., ECF No. 195

at 26; even if Mr. Acree "had made the objections that [Mr. Pole] now, in hindsight, insists were essential, there is no reasonable probability that the results [of his trial] would have been any different[,]" *United States v. Thomas*, 797 F. Supp. 19, 25 (D.D.C. 1992); *see also Strickland*, 466 U.S. at 693 (explaining that "[e]ven if a defendant shows that particular errors of counsel were unreasonable, . . . the defendant must show that they actually had an adverse effect . . . on the outcome of the proceeding[,]" not just "some conceivable effect"). In fact, "any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006). To the contrary, it is plausible that Mr. Mogilnicki's testimony aided the jury in seeing Mr. Pole in a positive light. For example, although Mr. Acree stated that he had no strategic reason for not considering Rule 408, he also testified that his thought-process on not objecting to Mr. Mogilnicki's testimony stemmed from his belief that Mr. Pole's repayment offer aligned with his strategy to positively depict Mr. Pole's character and desire "to act in the best interest of the office," rather than an intention to steal money. Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 56:1-2, 22-25, 58:2-4. Regardless, Mr. Mogilnicki's testimony on Mr. Pole's offer to

repay was "limited to a small portion of the trial[,] . . . took place on the very first day in the morning, and then was not discussed again." *Id.* at 19:20-20:6. It is not reasonably probable that "after ten days of trial, during which the government presented an overwhelming amount of evidence against Mr. Pole," that "this short testimony about the offer to repay could have impacted the jury's verdict." *Id.* at 20:7-11.

Ultimately, because the Court concludes that Mr. Pole has not met his burden in showing that the decision reached by the jury "would reasonably likely have been different absent [Mr. Acree's Rule 408] errors[,]" and because he has not shown "that counsel's errors were so serious as to deprive [him] of a fair trial," it rejects Mr. Pole's ineffectiveness claim regarding Mr. Acree's failure to object to certain portions of Mr. Mogilnicki's testimony. *Strickland*, 466 U.S. at 687, 696.[5]

---

[5] Mr. Pole newly argues in his objections that "the government capitalized on counsel's error" regarding Rule 408 "in its closing argument, directly referencing the meeting between Mr. Pole and Mr. Mogilnicki as the moment Mr. Pole was 'caught.'" Def.'s Objs., ECF No. 195 at 27. The Court finds this argument misleading, as the portions of the government's closing using the word "caught" do not reference Mr. Mogilnicki's testimony on Mr. Pole's offer to repay the unapproved bonuses or his impressions of that offer. *See, e.g.*, Trial Tr. (Jan. 31, 2011), ECF No. 121 at 9:8-13, 12:15-18, 17:16-18:4, 26:5-27:6, 74:4-12, 77:17-21, 80:1-9, 94:17-23. In fact, the government's closing never once mentions Mr. Pole's offer to repay the money.

### b. The Government's Use of Mr. Pole's Oath of Office in Its Closing Argument

Mr. Pole's second objection centers on the government's use of his oath of office in its closing argument at trial. Def.'s Objs., ECF No. 195 at 27-29. The government began its closing by displaying Mr. Pole's signed oath of office on the courtroom's projector and reading it aloud to the jury in its entirety:

> I, Ngozi Pole, do solemnly swear or affirm that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same, that I will take this obligation freely without any mental reservation or purpose of evasion, and that I will well and faithfully discharge the duties of the office on which I am about to enter, so help me God.

Trial Tr. (Jan. 31, 2011), ECF No. 121 at 8:2-9; Def.'s Hearing Ex. 220, ECF No. 186-1 at 11 ¶ 8. The prosecutor then told the jury that Mr. Pole "violated that oath time and time again . . . by stealing, by lying, by using the Senator's office as his own personal bank." Trial Tr. (Jan. 31, 2011), ECF No. 121 at 8:14-18. The parties dispute whether the oath of office was admitted into evidence at trial, as the government's final exhibit list indicates that it was admitted as the government's Exhibit 2 on January 19, 2011, but the trial transcripts do not reflect its admission. *See* Gov't's Opp'n, ECF No. 142 at 18 n.11; Def.'s Mot., ECF No. 139 at 18 n.6; Def.'s Objs., ECF No. 195 at 11, 27 n.4. Mr. Acree has stated that he does "not specifically recall

37

whether [the] Government's Exhibit 2 was admitted into
evidence[,]" and that "[i]f it was admitted," he did "not recall
objecting." Def.'s Hearing Ex. 220, ECF No. 186-1 at 11 ¶ 9.

Nonetheless, the R. & R. concluded that Mr. Acree's
"decision not to object" did not constitute ineffective
assistance of counsel because it was "strategic" and should not
be "second-guess[ed]." *See* R. & R., ECF No. 193 at 14-16. As
noted, the R. & R. did not consider Mr. Acree's sworn
declaration obtained by Mr. Pole's post-conviction counsel, in
which Mr. Acree admitted that he "had no strategic reason for
not objecting to the government's use of unadmitted evidence in
its closing argument[,]" and that to the extent the oath of
office was admitted at trial, he "had no strategic reason for
not objecting to its admission under Federal Rules of Evidence
401 and 403." Def.'s Hearing Ex. 220, ECF No. 186-1 at 11-12 ¶¶
10-11. The R. & R. also made no findings regarding the
admissibility of the oath of office, instead stating that "the
admissibility of this evidence is debatable, but ultimately
irrelevant." R. & R., ECF No. 193 at 14.

The Court disagrees with the R. & R., as "the merits of the
underlying claim," here being the admissibility of certain
evidence, "control the resolution of the *Strickland* claim
because trial counsel cannot have been ineffective for failing
to raise a meritless objection." *Zapata v. Vasquez*, 788 F.3d

1106, 1112 (9th Cir. 2015) (citation and internal quotation marks omitted); *accord United States v. Marshall*, 946 F.3d 591, 596 (D.C. Cir. 2020) (concluding that counsel's performance cannot be deficient if objecting "would have been meritless under the applicable legal standard"). Thus, the Court begins its analysis of this second objection by assessing Mr. Pole's argument that Mr. Acree's performance was deficient because "the admission of the oath was improper" under Rule 401 for being "irrelevant" and under Rule 403 for being "unduly prejudicial" and causing "confusion of the issues." Def.'s Objs., ECF No. 195 at 27; Def.'s Mot., ECF No. 139 at 20.

In making closing arguments, "a prosecutor has an obligation to avoid making statements of fact to the jury not supported by proper evidence introduced during trial[.]" *United States v. Moore*, 651 F.3d 30, 51 (D.C. Cir. 2011) (citation and internal quotation marks omitted). "The sole purpose of closing argument is to assist the jury in analyzing the evidence," and thus, in closing, "counsel may not refer to, or rely upon, evidence unless the trial court has admitted it." *Id.* at 52-53 (citations and internal quotation marks omitted). Although the government's final exhibit list indicates that Mr. Pole's oath of office was admitted as Exhibit 2, the Court is persuaded by both Mr. Pole's and the government's acknowledgements that the trial record never indicates "when and how [Mr. Pole's] oath of

office was admitted[,]" *see* Gov't's Opp'n, ECF No. 142 at 18
n.11; Def.'s Objs., ECF No. 195 at 27 n.4; into concluding, for
the purposes of this motion, that the oath was not properly
admitted into evidence. Accordingly, the Court considers whether
Mr. Pole's oath of office would have been admissible had it been
objected to and considered at trial.

The Court is persuaded by the caselaw provided by Mr. Pole
that had the issue been raised at trial, it would have excluded
the use of Mr. Pole's oath of office as evidence by the
government. For example, in *United States v. Jefferson*, 623 F.
Supp. 2d 678 (E.D. Va. 2009), the District Court for the Eastern
District of Virginia determined in a multi-count bribery, RICO,
money laundering, and honest services wire fraud prosecution
that the defendant's congressional oath of office, which
included the phrase, "I will well and faithfully discharge the
duties of the office on which I am about to enter[,]" was
inadmissible. *Id.* at 680-81. Without considering the defendant's
Federal Rule of Evidence 403 objection, that court concluded
that the oath was irrelevant and therefore inadmissible under
Rules 401 and 402 because the government had failed to explain
how the oath had "'any tendency to make the existence of any
fact that is of consequence to the determination of the action
more probable or less probable than it would be without the
evidence.'" *Id.* at 681 (quoting Fed. R. Evid. 401).

Similarly, in a case involving two American Samoan public officials on trial for federal procurement fraud, another judge from this court determined that the American Samoa oath of office must be excluded as irrelevant under Federal Rules of Evidence 401 and 402. Order, *United States v. Sunia*, No. 07-225 (RBW) (D.D.C. Dec. 28, 2009), ECF No. 194 at 1-2. In *Sunia*, the government sought to introduce the oaths for the purpose of "asserting that the defendants' knowledge of and actions inconsistent with their oaths . . . ma[de] it <u>more probable</u> that they possessed the requisite criminal intent[,] . . . [and] that the structuring of the procurement documents was the result of their fraud[.]" *Id.* at 1 (citation and internal quotation marks omitted). However, the district court judge concluded that there was "nothing in the plain language of the American Samoa oath that [would] make[] it 'more probable' that the defendants possessed the requisite criminal intent to be found guilty of the crimes alleged," as "the oath of office itself [did] not proscribe or compel any specific behavior on the part of the defendants." *Id.* at 2 (citing *Cole v. Richardson*, 405 U.S. 676, 678 n.1, 684, 92 S. Ct. 1332, 31 L. Ed. 2d 593 (1972)). Because "a fact-finder could not possibly infer from the oath that the defendants <u>knew</u> that any specific behavior was unlawful[,]" the judge deemed the fact that the defendants had taken the oath upon assuming office irrelevant and thus inadmissible. *Id.* at 3.

41

Following the reasoning in *Jefferson* and *Sunia*, the Court concludes that Mr. Pole's oath of office should have been excluded as irrelevant evidence because it does not "proscribe or compel any specific behavior on the part of" Mr. Pole in terms of spending down the budget or otherwise conducting his job duties. *Id.* at 2. Equivalent to the oath in *Jefferson*, Mr. Pole's oath of office includes the following phrase: "I will well and faithfully discharge the duties of the office on which I am about to enter . . . . " Trial Tr. (Jan. 31, 2011), ECF No. 121 at 8:7-9. The oath's plain language thus has no bearing on whether Mr. Pole could have known it was unlawful for him to spend down the budget by awarding bonuses without approval, and it therefore could not have "any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence[.]" Fed. R. Evid. 401(a)-(b). The government argues that there was "nothing impermissible about [its] use of [Mr.] Pole's oath" because it was evidence that "'is essentially background in nature[,]'" *see* Gov't's Opp'n, ECF No. 142 at 16-17 (quoting Fed. R. Evid. 401 advisory committee's note); but for the above reasons, the Court disagrees, concluding instead that because the oath was not relevant, it was also inadmissible. *See* Fed. R. Evid. 402.

The Court next considers whether Mr. Acree's failure to object to the government's use of Mr. Pole's inadmissible oath

of office in its closing argument was objectively unreasonable
and therefore deficient performance. "Generally, a tactical
decision by counsel to [with]hold an objection at trial is not
deficient[,]" *United States v. Browne*, 619 F. Supp. 3d 100, 112-
13 (D.D.C. 2022) (citations omitted); and whether to object
during a closing argument is often viewed as "'a matter of trial
strategy, which is ill-suited to second-guessing[,]'" R. &. R.,
ECF No. 193 at 14 (quoting *Richie v. Thaler*, No. H-11-3674, 2012
WL 1067224, at *14 (S.D. Tex. Mar. 28, 2012)). Although Mr.
Acree has testified that "it can be a loud thing when you object
during a closing" and that his general strategy focuses on
objecting during a closing argument only to something he feels
is "problematic," which he did not think was the case for the
oath of office, *see* Hearing Tr. (Apr. 7, 2022), ECF No. 188 at
53:24-54:5, 60:9-24, 61:22-62:11 ("I just didn't see what impact
[the oath] had on what was at issue in the case."); he has also
stated in a sworn declaration that he had "no strategic reason"
for not objecting to: (1) the government's use of the oath as
"unadmitted evidence" in its closing argument; and (2) the
admission of the oath under Federal Rules of Evidence 401 and
403, Def.'s Hearing Ex. 220, ECF No. 186-1 at 11-12 ¶¶ 10-11.
This statement therefore disproves the R. & R.'s conclusion that
Mr. Acree was "clear" in that "his decision not to object was
strategic." R. & R., ECF No. 193 at 14.

The Court finds the evidentiary record to be conflicting, since although Mr. Acree testified to some "strategic" thinking behind why he did not think there was a legal need to object to the government's use of Mr. Pole's oath of office in its closing, he has also stated that this thinking did not extend to considering the admissibility of the oath under Rules 401 and 403. Although there is a strong presumption in favor of trial counsel's decisions to withhold objections, including to statements "in a prosecutor's summation," *see, e.g.*, *Browne*, 619 F. Supp. 3d at 112-13; *Bussard v. Lockhart*, 32 F.3d 322, 324 (8th Cir. 1994); *Zapata*, 788 F.3d at 1115; Mr. Acree's failure to consider the admissibility of the oath of office thereby enabled the government to impermissibly refer to evidence that the trial court never admitted in the first place, *see Moore*, 651 F.3d at 53. There is therefore some credence to Mr. Pole's argument that Mr. Acree performed below an objective standard of reasonableness "under prevailing professional norms," *see* Def.'s Objs., ECF No. 195 at 27-28; *Strickland*, 466 U.S. at 688; especially since he failed to object to inadmissible evidence due to failure to consider the applicable Federal Rules of Evidence on not one, but two occasions, *see supra* section IV.A.1.a.; *Browne*, 619 F. Supp. 3d at 112 ("[A] constitutional defect occurs when counsel repeatedly fails to object to inadmissible evidence or misapprehends the law.").

Regardless, given the contradictory record, the Court need not decide *Strickland*'s deficient performance prong here because it concludes that even if Mr. Acree's failure to object to the use of Mr. Pole's oath of office in the government's closing was faulty, Mr. Pole has not shown a reasonable probability that "but for" this error, the result of his "proceeding would have been different." *Strickland*, 466 U.S. at 694.

First, although Mr. Pole refers to the government's use of his oath of office as "the centerpiece of its closing argument," *see* Def.'s Mot., ECF No. 139 at 19; Def.'s Objs., ECF No. 195 at 28; the Court's review of the trial transcript indicates that references to the oath are "limited to relatively small portions of" the government's entire closing argument, *Moore*, 651 F.3d at 54. Although the government began its summation by reciting Mr. Pole's complete oath of office, it never referenced the oath again throughout the remainder of its closing argument. *See* Trial Tr. (Jan. 31, 2011), ECF No. 121 at 8:2-29:15. Neither did the government list the oath among the types of "evidence in this case" that the jury should consider in deliberating, including "the testimony, the e-mails, the memos, [and] the charts," which it argued demonstrated that Mr. Pole was "guilty beyond a reasonable doubt of all counts." *Id.* at 29:8-14. As such, assuming the government impermissibly referenced evidence not admitted during trial in the beginning of its closing, this

misconduct—not objected to by Mr. Acree—was limited in nature, as opposed to a situation where "[i]nadmissible evidence and highly inflammatory statements c[o]me rolling in unimpeded throughout the trial in such a pervasive manner [so] as to undermine the soundness of the jury verdict." *Moore*, 651 F.3d at 54 (citation and internal quotation marks omitted). As the D.C. Circuit has stated, "absent consistent and repeated misrepresentation to influence a jury, [i]solated passages of a prosecutor's [closing] argument . . . do not reach the same proportions of severe misconduct" that, not objected to, is likely to "impermissibly and prejudicially interfere with the jury's ability to assess the evidence." *Id.* (citations and internal quotation marks omitted).[6]

---

[6] Magistrate Judge Faruqui also cited the D.C. Circuit's opinion in *United States v. Moore*, 651 F.3d 30, 51-55 (D.C. Cir. 2011), in concluding that "closing arguments rarely satisfy the second *Strickland* prong." R. & R., ECF No. 193 at 16. In his objections, Mr. Pole argues that "*Moore* is wholly inapposite" because it reviewed a prosecutorial misconduct claim based on improper opening and closing arguments, as opposed to a Sixth Amendment claim involving the same. Def.'s Objs., ECF No. 195 at 28. He further argues that *Moore* is irrelevant here because "prosecutorial misconduct claims are reviewed for 'substantial prejudice,' which is not the standard under *Strickland*." *Id.* The Court rejects this argument because prosecutorial misconduct claims and Sixth Amendment claims involving trial counsel's failure to object are often interrelated. In fact, all of the cases to which Mr. Pole cites following his rejection of *Moore*, *see id.*; discuss an ineffective assistance of counsel claim in the context of a failure to object to prosecutorial misconduct, *see, e.g.*, *Hodge v. Hurley*, 426 F.3d 368, 377 (6th Cir. 2005) (holding that "a failure to object to prosecutorial misconduct can amount to ineffective assistance of counsel"); *Zapata v.*

Second, the Court instructed the jury prior to the
beginning of summations that closing arguments "are not
evidence" and are only "intended by the attorneys to be a
summation of what the attorneys believe the evidence shows."
Trial Tr. (Jan. 31, 2011), ECF No. 121 at 7:14-18. Following the
completion of summations, the Court told the jury that during
deliberations, it could "consider only the evidence properly
admitted in trial[,]" which consisted of "the sworn testimony of
the witnesses, the exhibits that were admitted into evidence,
and the facts and testimony stipulated to by the parties." *Id.*
at 98:6-10. The Court then instructed the jury on the essential
elements of the charged offenses—wire fraud and theft of
government property—and the requirement that the government
prove each element beyond a reasonable doubt. *Id.* at 106:12-
111:10. Despite the Court's "cautionary instructions to the

---

*Vasquez*, 788 F.3d 1106, 1122-24 (9th Cir. 2015) (concluding that
defense counsel's failure to object to the prosecutor's
misconduct during closing, which included "inflammatory,
fabricated and ethnically charged epithets," constituted
ineffective assistance of counsel); *Girts v. Yanai*, 501 F.3d
743, 756-60 (6th Cir. 2007) (assessing whether prosecutorial
misconduct during closing, in conjunction with trial counsel's
failure to object, warranted a new trial). In addition, in
*Moore*, the D.C. Circuit stated that "review of allegedly
improper prosecutorial arguments is for substantial prejudice
where the defendants lodged an objection, but [that courts must]
apply the plain error standard where they failed to object." 651
F.3d at 50. Since Mr. Acree failed to object to the government's
improper use of Mr. Pole's unadmitted oath of office in its
closing argument, the higher "substantial prejudice" standard
would not have applied, contrary to Mr. Pole's argument.

jury" at the beginning of closing arguments and its "clear, concise, careful" instructions on the elements of the substantive offenses, *United States v. Jackson*, 627 F.3d 1198, 1213 (D.C. Cir. 1980); Mr. Pole argues that the use of the oath in the government's closing implied to the jury that it should "hold [him] to a higher standard than other defendants who do not take such oaths" and "suggest[ed] to the jury that it should convict [him] for violating his oath, as opposed to convicting him only after carefully considering the elements of wire fraud and/or theft[,]" Def.'s Mot., ECF No. 139 at 20.

However, because "[a] jury is presumed to follow a trial court's instructions[,]" *Jackson*, 627 F.3d at 1213 (citing *Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 367, 83 S. Ct. 448, 9 L. Ed. 2d 357 (1963)); and because the Court has concluded that the oath of office was irrelevant in proving the elements of the charged offenses, the Court agrees with the government that the use of the oath in its closing argument "was hardly a linchpin of [its] case" that could have "caused the jury to hold [Mr.] Pole to a higher standard than other defendants or to convict him simply for violating the oath[,]" Gov't's Opp'n, ECF No. 142 at 18; *see Strickland*, 466 U.S. at 693 (noting that just "some conceivable effect" on the trial outcome is insufficient to establish prejudice).

Finally, "[t]here was a wealth of additional evidence of guilt" in Mr. Pole's case that also indicates that Mr. Pole has failed to prove prejudice regarding his oath of office. *See* R. & R., ECF No. 193 at 15-16. Testimony from all four chiefs of staff that Mr. Pole did not have, nor was ever given, authority to award himself unapproved bonuses, combined with his acknowledgement that "no one ever told him to pay bonuses out on his own," *see* Trial Tr. (Jan. 31, 2011), ECF No. 121 at 18:1-4; is strong evidence negating the reasonableness of whether he could have "*understood*" and believed that he had authority to award bonuses on his own accord, Def.'s Objs., ECF No. 195 at 29; *see* Gov't's Opp'n, ECF No. 142 at 26 (explaining that this "unequivocal[]" chief-of-staff testimony "[w]ith respect to actual authority," coupled with Mr. Pole's "own words and actions," such as his budget memoranda and other correspondence requesting chief-of-staff review and approval of his recommended bonus and salary adjustments, "confirm that he did not have the authority to issue bonuses on his own, and he knew it").

The Court therefore concludes that there is "no 'reasonable probability' that a better closing argument without [the oath of office] defects would have made a significant difference" in the outcome of Mr. Pole's trial. *Smith v. Spisak*, 558 U.S. 139, 151, 130 S. Ct. 676, 175 L. Ed. 2d 595 (2010); *see also Glover*, 872 F.3d at 635 (balancing "the quantity of evidence" against the

appellants and "the minimal impact" of the error to conclude
that there was no prejudicial impact in counsel's failure to
object); *Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion
only weakly supported by the record is more likely to have been
affected by errors than one with overwhelming record support.");
*cf. Hodge v. Hurley*, 426 F.3d 368, 386-87 (6th Cir. 2005)
(finding a reasonable probability of prejudice when the failure
to object occurred in "a close case at the trial level").
Accordingly, the Court rejects Mr. Pole's ineffectiveness claim
regarding Mr. Acree's failure to object to the government's use
of his unadmitted oath of office in its closing argument.

> ## 2. Mr. Acree Was Not Ineffective for Not Using and Introducing Certain Pieces of Evidence During Trial

The Court next addresses Mr. Pole's objections regarding
the R. & R.'s alleged misapprehension of "the core issue at
trial," specifically in relation to its conclusions that Mr.
Acree was not ineffective for not using or introducing into
evidence copies of Mr. Pole's unredacted budget memoranda and
employment history transcripts obtained by Mr. Pole's post-
conviction counsel from the U.S. Senate, reflecting the salary
histories of various former employees of Senator Kennedy. *See*
Def.'s Objs., ECF No. 195 at 13, 17, 22, 29-38.

The Court begins by assessing the "backdrop" issue of
whether Magistrate Judge Faruqui incorrectly "grasp[ed] the

central issue" of Mr. Pole's trial, *id.* at 22, 32; which as
stated by the D.C. Circuit, was "whether [Mr.] Pole knew he
needed authorization to award bonuses[,]" *i.e.*, whether "he
reasonably believed he had authority to award himself unapproved
annual bonuses[,]" *Pole*, 741 F.3d at 124, 127. Thus, as Mr. Pole
contends, the "central issue" was what he "*understood* about his
authority, not whether he actually *had* authority." Def.'s Objs.,
ECF No. 195 at 30 (emphasis in original). At one point in the R.
& R.'s analysis, Magistrate Judge Faruqui states that the "issue
at trial was . . . about whether Mr. Pole had the authority to
issue bonuses without chief of staff approval."  R. & R., ECF
No. 193 at 21. In addition, in the factual and procedural
background section, the R. & R. "makes a passing assertion that
'Mr. Pole understood that he needed final approval from the
chief of staff for all bonuses[,]'" Def.'s Objs., ECF No. 195 at
31 (quoting R. & R., ECF No. 193 at 4); and that "everyone
understood that [the bonuses] process required approval by the
chief of staff[,]" R. & R., ECF No. 193 at 4. The Court agrees
with Mr. Pole that these statements are problematic specifically
because they speak conclusively, early on in the R. & R., "on
the issue that was critical to Mr. Pole's guilt or innocence" at
trial. *See* Def.'s Objs., ECF No. 195 at 30-31.

However, the Court's review of the R. & R. does not
indicate that it is entirely permeated by the same error. For

example, in summarizing the details of Mr. Pole's trial, Magistrate Judge Faruqui writes that "Mr. Acree's main defense was that Mr. Pole *believed* he had the [implicit] authority to spend the budget down to zero." *Id.* at 5-6 (emphasis added). In addition, the R. & R. discusses Mr. Acree's good faith defense strategy at trial, which aimed to show that Mr. Pole's "specific intent was not to steal," but rather that he reasonably believed he was "compl[ying] with what the Senator wanted."[7] *See id.* at 9-

_____

[7] Mr. Pole challenges—in a footnote—Magistrate Judge Faruqui's rejection of Mr. Pole's claim in his motion for a new trial that Mr. Acree was ineffective for failing "to pursue a good-faith defense . . . , including the failure to request a jury instruction on good faith." Def.'s Objs., ECF No. 195 at 30 n.6. He objects to the R. & R.'s statement that "Mr. Acree's strategy at trial was to show that [Mr. Pole's] specific intent was not to steal, but rather to ensure the office complied with what the Senator wanted[,]" R. & R., ECF No. 193 at 9; as he argues if evidence existed indicating that the Senator approved of Mr. Pole's actions, then "presumably the government would not have tried this case[,]" Def.'s Objs., ECF No. 195 at 30 n.6. The Court is unpersuaded by this argument and agrees with the reasoning behind Magistrate Judge Faruqui's determination that Mr. Acree's defense "in essence was a good faith defense" that sought to negate the specific intent elements of the charged crimes, *i.e.*, that Mr. Pole did not intend to defraud or steal from the government. R. & R., ECF No. 193 at 10; Gov't's Opp'n, ECF No. 142 at 8; *see United States v. Pole*, 741 F.3d 120, 124 (D.C. Cir. 2013) (explaining that Mr. Pole's defense at trial was "that he had implicit authority to spend down the budget" and that he therefore lacked the requisite criminal intent). Mr. Pole also objects to the R. & R.'s conclusion regarding the good faith jury instruction but proffers no specific arguments as to why it should be rejected. *See* Def.'s Objs., ECF No. 195 at 30 n.6. Because Mr. Pole "makes only conclusory or general objections, [and] simply reiterates his original arguments" on these points, the Court reviews this objection only for clear error. *Houlahan v. Brown*, 979 F. Supp. 2d 86, 88 (D.D.C. 2013) (citation and internal quotation marks omitted). Finding no

11. Furthermore, even though Mr. Pole argues that the R. & R.'s repeated citations to testimony from the chiefs of staff that Mr. Pole "did not have authority to issue spend-down bonuses" was irrelevant to the actual issue, such testimony directly speaks to the reasonableness of Mr. Pole's beliefs regarding his understanding of that authority. Def.'s Objs., ECF No. 195 at 32. Thus, in many respects, the R. & R. properly assesses Mr. Pole's ineffective assistance of counsel claims against a "backdrop" where the primary issue was whether Mr. Pole could have reasonably believed that he had authority to spend down the budget by awarding to himself and other staffers unapproved bonuses. *See* Gov't's Resp., ECF No. 196 at 3 n.1.

Nonetheless, out of an abundance of caution, the Court reviews de novo Mr. Pole's objections to Magistrate Judge Faruqui's conclusions that Mr. Acree was not ineffective for not using and introducing into evidence: (1) unredacted budget memoranda; and (2) employment history transcripts. *See* R. & R., ECF No. 193 at 20-24. Mr. Pole argues that Mr. Acree's failure to use both the unredacted budget memoranda and the employment history transcripts was prejudicial to his defense "that he genuinely believed he had authority to spend-down the surplus by

---

error, the Court **ADOPTS** the portion of the R. & R. pertaining to Mr. Pole's good faith defense argument. *See* R. & R., ECF No. 93 at 9-12.

issuing extra bonuses" without prior authorization. Def.'s
Objs., ECF No. 195 at 32. The Court addresses this argument in
relation to these two forms of evidence in turn below.

### a. Mr. Pole's Unredacted Budget Memoranda

In his motion for a new trial, Mr. Pole argues that Mr.
Acree was ineffective in failing "to obtain and use during
trial" Mr. Pole's unredacted budget memoranda that showed he
"continuously and accurately informed the chiefs of staff about
budget surpluses." Def.'s Mot., ECF No. 139 at 20. He states
that while on the stand, he "testified that he routinely
informed his supervisors about high budget surpluses," and that
these memoranda would have substantiated this testimony, as they
"put the budget surplus numbers front and center for [the
jury's] attention." Def.'s Objs., ECF No. 195 at 11, 17.
However, as Mr. Pole states, he was prevented by the Court,
following an objection from the government, from testifying to
the contents of the memoranda, which were "heavily redacted,
including with respect to the surplus numbers." *Id.* at 11-12.

Mr. Pole similarly argued on appeal to the D.C. Circuit
that this Court erred in refusing "to permit him to testify
about the contents of certain [redacted] budget memos." *Pole*,
741 F.3d at 124. The D.C. Circuit set the stage for this
argument as follows:

> The issue arose when [Mr.] Pole testified that
> he 'let Ms. Cahill know that the surplus
> numbers were high [in fiscal year 2002].'
> Trial Tr. 67 (Jan. 26, 2011 Afternoon
> Session). Noting that some budget memos he
> sent [Ms.] Cahill had been entered into
> evidence, [Mr.] Pole then attempted to testify
> that the 'place where I traditionally would
> put [the projected surplus] number is redacted
> so it's hard to see.' *Id.* The government
> objected, arguing that [Mr.] Pole should not
> be allowed to testify about redacted contents.
> Sustaining the objection, the district court
> stated only that the redacted contents
> are 'not a part of the evidentiary record.' *Id.* at
> 68-69.

*Id.* at 125. This Court then twice instructed the jury that the

information beneath the redactions "ha[d] nothing to do with

this case." Trial Tr. (Jan. 26, 2011), ECF No. 87 at 69:12-17,

70:6-10. Mr. Pole alleges that Mr. Acree did not object to this

instruction or "attempt to introduce unredacted memos[,]" and

that before trial, Mr. Acree stipulated to the government's use

of the redacted budget memoranda and instructions to the jury to

disregard the redactions. Def.'s Mot., ECF No. 139 at 21; Def.'s

Objs., ECF No. 195 at 12; R. & R., ECF No. 193 at 5.

Mr. Pole argues that "[t]he evidence beneath the

redactions," including those which covered the budget surplus

amounts, "was material, exculpatory, and should have been

admitted into evidence" because he contends that they were

"crucial" to his claims that the chiefs of staff were "informed

of surpluses, failed to spend them, and that [Mr.] Pole

55

concealed neither surpluses nor spend-down bonuses." Def.'s
Mot., ECF No. 139 at 21-22. However, during the evidentiary
hearing, Mr. Acree testified that he did not seek to admit
unredacted versions of the budget memoranda because he did not
view the budget surplus numbers "as a contested issue[.]"
Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 66:13-21. Mr. Acree
stated his belief that there was other evidence introduced at
the trial "that showed there was a budget surplus," a fact which
the government was not disputing, and that "the whole crux of
[his] argument" was "not whether it was a surplus," but rather
"Mr. Pole's state of mind and [the] circumstances" surrounding
his understanding of his "authority or lack thereof . . . to
act" to spend down the budget by awarding unapproved bonuses.
*See id.* at 66:22-70:22. Mr. Acree further explained his belief
that "the documents were not our friend on the crux of . . . the
issue" and his strategy to try and focus the jury's attention on
the central issue "as much as possible because the [documents]
didn't speak favorably for us so much." *Id.* at 70:18-22.

Based on this testimony, the Court concludes that Mr.
Acree's various decisions surrounding his alleged "failure" to
obtain and use Mr. Pole's unredacted budget memoranda were
informed by strategic analysis. Mr. Acree correctly noted that
the central issue at trial was "not whether Mr. Pole kept the
chiefs of staff informed about the budget surplus numbers[,]" R.

& R., ECF No. 193 at 21; especially since the government did not take the position "that there was not a surplus or that Mr. Pole was spending beyond the budget itself[,]" Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 69:18-21; but rather the issue was whether Mr. Pole "reasonably believed he had authority to award himself unapproved annual bonuses[,]" *Pole*, 741 F.3d at 127. As Mr. Acree explained, his strategy was to deemphasize the documents and focus on "Mr. Pole's state of mind," the "crux" of the case, rather than present additional evidence on an undisputed point. Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 70:7-22. Given the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]" the Court concludes that Mr. Acree's strategy was "sound," "reasonable," and entitled to deference. *Strickland*, 466 U.S. at 689.

Mr. Pole nonetheless argues that Mr. Acree's performance was deficient because he alleges that the government's objection to Mr. Pole testifying about the redacted documents was based on a false representation from the prosecutor "that she had never seen what lay underneath the redactions," when in fact "both the government and trial counsel were in possession of unredacted budget memos by the time of Mr. Pole's trial[.]" Def.'s Objs., ECF No. 195 at 12, 32. Mr. Pole contends that had Mr. Acree done a proper investigation, he would have known that his law firm possessed and produced copies of the unredacted budget memoranda

to the government during discovery and therefore objected to the prosecutor's representation that she had not seen the material beneath the redactions, instead of taking the prosecutor "at her word," *see* Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 34:10-22; and stipulating to the instruction to the jury that they not "speculate or concern themselves with the redacted information," Joint Request for Suppl. Jury Instruction, ECF No. 40 at 2; *see* Def.'s Objs., ECF No. 195 at 32-33.

Even assuming the truth of Mr. Pole's claims that Mr. Acree "missed" the unredacted budget memoranda, Def.'s Objs., ECF No. 195 at 33; the Court concludes that Mr. Pole has failed to demonstrate that Mr. Acree's performance was deficient. Mr. Acree testified that his defense strategy, aimed at showing the reasonableness of Mr. Pole's understanding of his authority to award unapproved bonuses, was focused less on using documents such as the budget memoranda, which he generally viewed as unfavorable to proving this issue, *see* Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 70:7-22; and thus the Court deems it logical—and strategic—that Mr. Acree devoted less time and attention to such documents during his review of discovery and preparation for trial, *see Wiggins*, 539 U.S. at 512 (concluding that "'strategic choices made after less than complete investigation are reasonable'" when within the "'limitations'" placed on that investigation by "'reasonable professional

58

judgments'" (quoting *Strickland*, 466 U.S. at 690-91)); *Dunn*, 594
U.S. at 739 (acknowledging that "[d]efense lawyers have
'limited' time and resources" and must make "difficult" choices
when "choos[ing] from among 'countless' strategic options"
(quoting *Harrington*, 562 U.S. at 106-07)). Thus, "even if there
is reason to think that counsel's conduct 'was far from
exemplary'" by not: (1) recognizing that his law firm was in
possession of the unredacted budget memoranda prior to trial;
(2) challenging the prosecutor's representations on objection;
and (3) attempting to use the unredacted budget memoranda as
evidence, the Court "still may not grant relief [since] '[t]he
record does not reveal' that [Mr. Acree] took an approach that
no competent lawyer would have chosen." *Dunn*, 594 U.S. at 739
(quoting *Burt*, 571 U.S. at 23-24).

Furthermore, even if Mr. Acree's above strategic decisions
could be construed as "objectively unreasonable," Mr. Pole's
objection still fails because he cannot show prejudice to the
outcome of his trial from Mr. Acree's failure to introduce into
evidence the unredacted budget memoranda. When the D.C. Circuit
remanded this ineffective assistance of counsel claim, it noted
that "[h]ad [Mr.] Pole's counsel introduced unredacted memos
demonstrating that [Mr.] Pole kept [Ms.] Cahill informed about
surpluses, the jury might have found [Mr.] Pole a more credible
witness." *Pole*, 741 F.3d at 127. Mr. Pole points to this

language in his objection, arguing that it proves that there was

"no adequate substitute" for the unredacted budget memoranda as

evidence since "the D.C. Circuit presumably would not have

remanded in the first place." Def.'s Objs., ECF No. 195 at 34,

36. The Court disagrees, since the D.C. Circuit remands

"colorable" ineffectiveness claims to the district court to make

necessary factual findings under a "forgiving standard," which

thus does not mean that the remanding of a claim automatically

entitles Mr. Pole to relief. *Pole*, 741 F.3d at 126-27 (citing

*Moore*, 651 F.3d at 85, 87). As the D.C. Circuit stated: "To be

clear, we conclude only that [Mr.] Pole's claims of ineffective

assistance are colorable, not that he has likely demonstrated

ineffective assistance. Indeed, the government offers several

plausible arguments suggesting that [Mr.] Pole has shown neither

error nor prejudice." *Id.* at 127.

Following a review of the record, the Court concludes that

Mr. Pole has failed to demonstrate that the unredacted budget

memoranda were indispensable pieces of evidence such that he was

prejudiced by their omission. First, on the topic of budget

surpluses, Mr. Pole "was allowed to testify that he kept chiefs

of staff informed about budgetary matters and in fact did

testify that he 'let Ms. Cahill know that the surplus numbers

were high.'" *Id.* at 125; *see also* Trial Tr. (Jan. 26, 2011), ECF

No. 87 at 62:24-63:5, 66:14-67:17; Trial Tr. (Jan. 28, 2011),

ECF No. 89 at 22:19-23:2, 31:20-25. Mr. Pole's testimony was also corroborated by correspondence admitted at trial indicating that he conveyed projected surplus numbers to the chiefs of staff. *See* R. & R., ECF No. 193 at 22 (listing the government's trial exhibits 3, 6, 11, 27, 30, and 38 as examples of such correspondence); Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 67:11-69:9 (highlighting some of these exhibits during the evidentiary hearing to show that they "project[ed] the fact that there was a budget surplus in the office"). Thus, although the unredacted budget memoranda may have additionally corroborated Mr. Pole's testimony, the record disproves his contention that without them, "his ability to" prove that he reported surplus numbers to his bosses "was significantly limited." *See* Def.'s Objs., ECF No. 195 at 34, 36. The Court therefore agrees with Magistrate Judge Faruqui that the unredacted budget memoranda "did not differ in a substantial way—in strength and subject matter—from the evidence actually presented at trial," and that their admission as evidence "would have been cumulative," thereby negating any prejudice to Mr. Pole. R. & R., ECF No. 193 at 21-22 (citations and internal quotation marks omitted).

This conclusion is buttressed by the D.C. Circuit's conclusion on appeal that any error by this Court in refusing to allow Mr. Pole to testify to the contents of the redacted budget memoranda was "harmless" and "did not contribute to the verdict

obtained." *See Pole*, 741 F.3d at 125 (concluding that "if the jury found that [Mr.] Pole lacked credibility, it would have no reason to believe his assertions about what lay under the redactions; if the jury found [him] generally credible, it would have learned nothing new from the excluded testimony" (citations and internal quotation marks omitted)). The same finding is true for the unredacted versions of the memoranda themselves, since if the jury had found Mr. Pole to be generally credible, it would have learned nothing new from the unadmitted, unredacted memoranda, as Mr. Pole's testimony on the budget surplus numbers was already substantiated by other correspondence. And again, because the main issue at trial was not whether Mr. Pole "routinely and accurately informed the Chiefs of Staff that the office was running substantial projected budget surpluses," *see* Def.'s Mot., ECF No. 139 at 21; Def.'s Objs., ECF No. 195 at 34; but rather whether he reasonably believed he had authority to spend down those surpluses by issuing himself unapproved bonuses, *Pole* 741 F.3d at 127; the omission of the unredacted budget memoranda could not be "extremely prejudicial" to Mr. Pole's defense, Def.'s Objs., ECF No. 195 at 32.[8]

---

[8] Mr. Pole adds a new argument in his objections that the R. & R. ignores "testimony from chiefs of staff who testified that they would've spent funds on other resources, had they known about large surpluses[,]" and that the unredacted budget memoranda are important because they show, contrary to this testimony, that the chiefs of staff "*did* know about the surpluses[.]" Def.'s

### b. Employment History Transcripts Reflecting the Salary Histories of Former Employees of Senator Kennedy's Office

Mr. Pole next argues in his motion for a new trial that Mr. Acree "was ineffective in failing to demonstrate through the available documentary evidence that [Mr.] Pole routinely issued exit bonuses without specific Chief of Staff approval." Def.'s Mot., ECF No. 139 at 22. He claims that this evidence should have included employment history transcripts obtained from the U.S. Senate following remand of his case from the D.C. Circuit, which he contends "fully corroborate [his] testimony that exit bonuses were [a] routine" office practice during his tenure and "that Mr. Pole regularly issued them." *Id.*; *see* Ex. 4 to Def.'s Mot., ECF No. 139-4 at 1-36 (employment history transcripts for various former employees of Senator Kennedy). As such, he argues that the transcripts would have discredited the chiefs of staff who sought to "downplay the practice of issuing exit bonuses" and impeached their testimony that Mr. Pole "was not allowed to issue exit bonuses." Def.'s Mot., ECF No. 139 at 22. Mr. Pole thus argues that these transcripts would have supported his defense that he had a reasonable belief in his authority to

---

Objs., ECF No. 195 at 36. The Court does not consider this argument, since, in the section of Mr. Pole's motion for a new trial regarding the unredacted budget memoranda, he did not dispute that the chiefs of staff were "informed of surpluses[.]" Def.'s Mot., ECF No. 139 at 21.

spend down the budget by awarding bonuses himself, and that Mr. Acree's failure to obtain and introduce them into evidence was both objectively unreasonable and prejudicial. *Id.*; Def.'s Objs., ECF No. 195 at 36-38. As the D.C. Circuit stated in remanding this "colorable" ineffectiveness claim: "Had [Mr.] Pole's counsel been able to demonstrate that [Mr.] Pole had authority to issue exit bonuses without prior approval, [Mr.] Pole might have avoided conviction on the wire fraud count arising from his exit bonus and even convinced the jury that he reasonably believed he had authority to award himself unapproved annual bonuses." *Pole*, 741 F.3d at 127.

Magistrate Judge Faruqui rejected these arguments because he found that the employment history transcripts do not actually show that Mr. Pole was the individual "responsible for issuing any of the exit bonuses supposedly reflected therein[.]" Gov't's Opp'n, ECF No. 142 at 20; *see* R. & R., ECF No. 193 at 23. Following its own review of the employment history transcripts, the Court agrees. The transcripts reflect the salary histories for twenty-seven former Kennedy employees, including former chiefs of staff Mr. Kavanaugh and Ms. Petroshius and former Political Director Tracy Spicer ("Ms. Spicer"), all of whom were government witnesses. *See* Def.'s Objs., ECF No. 195 at 37. However, the Court agrees with the government that the transcripts are unclear as to "what salary changes, if any, were

exit bonuses[,]" Gov't's Opp'n, ECF No. 142 at 20 n.13; and only reflect incremental salary changes associated with various dates throughout the employee's period of employment, *see* Ex. 4 to Def.'s Mot., ECF No. 139-4 at 1-36. The transcripts also do not include Mr. Pole's name, thus never specifically indicating that if a certain number was meant to reflect an exit bonus, Mr. Pole was the one who issued it, "let alone that he did so without authorization from the [c]hief[s] of [s]taff." Gov't's Opp'n, ECF No. 142 at 20.

Rather, the Court views the employment transcripts as bolstering facts about Mr. Pole's case that were not disputed at trial. First, as the D.C. Circuit has noted, it was an office practice in Senator Kennedy's office, "condoned by the Senator and chiefs of staff," to award annual bonuses and exit bonuses notwithstanding the official Senate ban. *Pole*, 741 F.3d at 123. To do this, the "office would, with the Senator's or chief of staff's approval, submit PAAs that increased an employee's salary for a period of time—two or three weeks or even a month— sufficient to produce the intended [annual] bonus[,]" and to award exit bonuses, employees were either kept on payroll for a few weeks after their departure or "for an indefinite period at a salary just high enough to cover the employee contribution for Senate-subsidized health care." *Id.* at 123-34. As such, there was "no dispute that departure bonuses were awarded to certain

65

staff during [Mr.] Pole's tenure[,]" Gov't's Opp'n, ECF No. 142 at 20 n.14; *see, e.g.*, Trial Tr. (Jan. 20, 2011), ECF No. 83 at 109:22-116:17 (Ms. Cahill's testimony); Trial Tr. (Jan. 24, 2011), ECF No. 85 at 97:3-12 (Ms. Petroshius' testimony); R. & R., ECF No. 193 at 23 (citing the government's trial exhibit 42, an email from Mr. Pole stating that Mr. Mogilnicki "signed off" on two exit bonuses); Ex. 5 to Def.'s Mot., ECF No. 139-5 at 8 (reflecting a phone conversation between Mr. Mogilnicki and Ms. Spicer in which Ms. Spicer said she received severance pay and that "it had been done over the past 8-10 years, but there wasn't a formal policy"); which is only confirmed by reference to the employment history transcripts if certain numbers in those transcripts are taken to reflect exit bonuses, as Mr. Pole contends, *see* Def.'s Objs., ECF No. 195 at 37.

It was also not disputed that Mr. Pole was the employee responsible for submitting the PAAs to the Senate Disbursing Office, which would trigger payment of the salary raises or bonuses. *See Pole*, 741 F.3d at 123-24. Rather, the central dispute at trial was whether Mr. Pole reasonably believed he could submit PAAs initiating the payment of bonuses without prior authorization from the Senator or chiefs of staff. *Id.* at 124. Thus, although the employment history transcripts may show that exit bonuses were a "routine" Kennedy office practice, nothing in them details the proper authorization protocols for

such bonuses and who specifically could give authorization.
Instead, as the R. & R. states, the record evidence was
overwhelming in showing that "approval was needed from someone
at a higher level than Mr. Pole[,]" ECF No. 193 at 23; even if
there was some confusion among the chiefs of staff as to whether
that higher authority was themselves, Senator Kennedy, or both
given the lack of official or written policies on the bonus
procedure, *see, e.g.*, Trial Tr. (Jan. 24, 2011), ECF No. 85 at
98:6-17 (testimony from Ms. Petroshius indicating that "the
chief of staff and up the same chain-of-command" had authority
to approve departure bonuses while Mr. Pole did not); Trial Tr.
(Jan. 19, 2011), ECF No. 82 at 8:3-8 (testimony from Mr.
Mogilnicki indicating that only the Senator and himself had
authority to approve bonuses); Trial Tr. (Jan. 20, 2011), ECF
No. 83 at 17:13-22, 103:22-104:5, 113:12-114:1 (equivalent
testimony from Mr. Kavanaugh and Ms. Cahill, who also explained
that Mr. Pole would provide her with suggested bonuses for
staffers that she would review and approve, in conjunction with
Senator Kennedy, before Mr. Pole "put the bonuses into practice
with the Senate Disbursing Office").

Therefore, the Court disagrees with Mr. Pole's argument
that the employment history transcripts were "critical" to
corroborating his good faith defense because they do not speak
to who had authority to approve bonuses, only that such bonuses

occurred, which was not disputed by the chiefs of staff who testified (and thereby the transcripts do not impeach their testimony as Mr. Pole argues). *See, e.g.*, Trial Tr. (Jan. 20, 2011), ECF No. 83 at 17:13-28 (testimony from Mr. Kavanaugh stating that he awarded bonuses to staffers when he was chief of staff), Trial Tr. (Jan. 24, 2011), ECF No. 85 at 97:20-98:9 (testimony from Ms. Petroshius that it was "common practice" when she was chief of staff to award departure bonuses through the appropriate "chain-of-command").

Accordingly, the Court concludes that, in conjunction with Mr. Acree's above-delineated strategy to focus less on the documents themselves and more on proving Mr. Pole's "state of mind," Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 70:5-22; Gov't's Opp'n, ECF No. 142 at 20 (contending that there is no admissible documentary evidence in existence that proves Mr. Pole "had the authority" to issue unapproved bonuses); Mr. Acree's alleged "failure" to obtain and use the employment history transcripts was neither deficient performance nor prejudicial to the outcome of Mr. Pole's trial. Mr. Acree did elicit testimony from Mr. Pole that during his employment with Senator Kennedy's office, he routinely issued exit bonuses without specific approval, *see, e.g.*, Trial Tr. (Jan. 28, 2011), ECF No. 89 at 72:3-23; and while the employment transcripts may have bolstered this testimony to a degree, their contents do not

specifically corroborate Mr. Pole's statements that he was the employee who both issued *and* authorized any bonuses contained therein, *i.e.*, without approval from any higher office authority. Because Mr. Pole has not met his burden in showing a reasonable probability that he would have been acquitted on the wire fraud count arising from his exit bonus had the employment history transcripts been introduced as documentary evidence, *see* Def.'s Objs., ECF No. 195 at 37-38; the Court concludes that this ineffective assistance of counsel claim must fail, *see* *United States v. Doost*, 3 F.4th 432, 443-44 (D.C. Cir. 2021) (stating that "[d]etermining how a hypothetical jury would have analyzed additional evidence . . . 'is inherently a speculative exercise,'" and concluding that the defendant fell short of "showing a reasonable probability that introducing" additional documentary evidence "would have resulted in acquittal" on the particular charge in question (citation omitted)).

### 3. Mr. Acree Was Not Ineffective Because He Did Not Commit Any Errors with Cumulative Prejudicial Effect

The Court turns to Mr. Pole's final group of objections centering on the R. & R.'s alleged failure "to consider the cumulative effect of the numerous errors" allegedly committed by Mr. Acree. Def.'s Objs., ECF No. 195 at 38. Specifically, Mr. Pole argues that Magistrate Judge Faruqui's rejection of his claims that Mr. Acree was ineffective for failing to: (1)

impeach the testimony of Ms. Cahill and Ms. Petroshius; and (2) call Mr. McCarthy as a witness, was improper because "each individual error was ineffective," and also "the cumulative effect of those errors plainly warrants vacating [his] conviction." *See id.* at 38-45. "Viewing these alleged errors cumulatively," for the reasons discussed below, the Court concludes that Mr. Pole "has not shown 'a reasonable probability that, but for counsel's [alleged] errors, the result of the proceeding would have been different.'" *Browne*, 619 F. Supp. 3d at 113 (quoting *Strickland*, 466 U.S. at 694).

### a. Failure to Impeach Mary Beth Cahill's Testimony

As stated by the D.C. Circuit, Mr. Pole argues that Mr. Acree should have "demonstrate[d] that [Ms.] Cahill," a former chief of staff, "instructed [Mr.] Pole to spend the budget to zero, or [should have] impeach[ed] her testimony that she did not do so." *Pole*, 741 F.3d at 126 (citation and internal quotation marks omitted). Mr. Pole's argument is based on an FBI interview report indicating that Mr. Mogilnicki told the FBI about certain conversations he had with Ms. Cahill. *See* Ex. 5 to Def.'s Mot., ECF No. 139-5 at 10. The report states that after his meeting with Mr. Pole and Mr. Craig, Mr. Mogilnicki called Ms. Cahill "to check [Mr.] Pole's story." *Id.* Mr. Mogilnicki reported to the FBI that in this phone conversation, Ms. Cahill

told him that "she told [Mr.] Pole to zero out the budget, but did not think she approved any of [Mr.] Pole's extra bonuses." *Id.* Mr. Pole uses the first portion of Mr. Mogilnicki's statement to argue that Ms. Cahill's "directive to [him to zero out the budget] was never elicited from [her] at trial." Def.'s Mot., ECF No. 139 at 22. He contends that this was "an extremely damaging omission by" Mr. Acree because it undermined his good faith defense and caused a missed opportunity for both impeachment of Ms. Cahill and corroboration of his statement to Mr. Mogilnicki and Mr. Craig in their January 26, 2007 meeting that it was Ms. Cahill who told him to spend down the budget. *Id.* at 22-23 (citing Mr. Craig's testimony, Trial Tr. (Jan. 25, 2011), ECF No. 86 at 57:18-24, 60:2-10).

Although the D.C. Circuit concluded, in remanding this "colorable" ineffectiveness claim, that "had [Mr.] Pole's counsel successfully impeached [Ms.] Cahill . . . , [Mr.] Pole might have undermined [her] testimony that he needed [Ms. Cahill's] approval before making salary adjustments[,]" *Pole*, 741 F.3d at 127; following his review of the record, Magistrate Judge Faruqui rejected this claim for lack of deficient performance and prejudice, *see* R. & R., ECF No. 193 at 18-19. The substance of Mr. Pole's objection to this conclusion raises proper, specific arguments against the R. & R.'s findings, so the Court reviews this objection de novo. *See* LCvR 72.3(b).

During Mr. Pole's trial, Ms. Cahill testified that she never told "Mr. Pole that he could spend down the budget *without checking with [her]*" or "that he had the authority to spend down the budget *on his own*." Trial Tr. (Jan. 21, 2011), ECF No. 84 at 47:16-21 (emphasis added). In the R. & R., Magistrate Judge Faruqui summarized this testimony by stating that Ms. Cahill "testified that while she may have asked Mr. Pole to spend the budget down to zero, she never permitted him to do so *alone and without approval*." R. & R., ECF No. 193 at 18 (emphasis added). After comparing this testimony that Ms. Cahill never instructed Mr. Pole to spend down the budget "on his own" with Mr. Mogilnicki's statement in the FBI report that Ms. Cahill only told Mr. Pole "to zero out the budget," Magistrate Judge Faruqui concluded that "the two statements were consistent" and that "impeachment was unnecessary," and as a result Mr. Acree's "strategic choice[]" to not impeach Ms. Cahill was "not deficient." *Id.* However, Mr. Pole argues that Magistrate Judge Faruqui's characterization of Mr. Acree's failure to impeach Ms. Cahill as "strategic" is "misplaced" because during the evidentiary hearing, Mr. Acree was never asked about "his decision not to impeach Ms. Cahill" and only generally testified about his overall impeachment "strategy." Def.'s Objs., ECF No. 195 at 40. As such, Mr. Pole contends that without any specific testimony from Mr. Acree on the issue, Mr. Acree's inaction in

regard to impeaching Ms. Cahill is not entitled to deference as a "strategic" choice. *Id.*

Based on the evidentiary hearing transcript, the Court agrees with Mr. Pole that there is not sufficient evidence in the record to determine that Mr. Acree's failure to impeach Ms. Cahill was a strategic decision. Mr. Acree only testified about his general "strategy for impeaching witnesses," which is to impeach when "in the end it's helpful," as opposed to when it "might do more harm than good" or "might highlight a bad fact." *See* Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 62:12-64:4. However, even assuming, as Mr. Pole contends, that Mr. Acree was deficient for failing to investigate and prepare for impeaching Ms. Cahill, *see* Def.'s Objs., ECF No. 195 at 40-41; for the below reasons, the Court agrees with Magistrate Judge Faruqui's conclusion that "there was no prejudice to Mr. Pole" in this regard, R. & R., ECF No. 193 at 18.

The Federal Rules of Evidence provide procedures governing how to attack the credibility of witnesses, including by using a witness's prior inconsistent statements. *See* Fed. R. Evid. 607, 613; *United States v. Stock*, 948 F.2d 1299, 1301 (D.C. Cir. 1991) ("One may impeach a witness by asking him about prior inconsistent statements."). "It is the well settled rule in this circuit that a prior inconsistent statement used to impeach a witness is admissible solely to affect credibility of the

witness and is not to be considered as support for the truth of its contents." *United States v. Gilliam*, 484 F.2d 1093, 1096 (D.C. Cir. 1973); *see also United States v. Wright*, 489 F.2d 1181, 1187 (D.C. Cir. 1973) ("[P]rior inconsistent statements are admissible only for impeachment purposes, not as substantive evidence to prove the truth of the matter asserted, and the jury should be instructed to this effect."). "Prior statements that omit details covered at trial are inconsistent if it would have been 'natural' for the witness to include them in the earlier statement." *Stock*, 948 F.2d at 1301.

Here, the Court concludes that Ms. Cahill's testimony is not sufficiently inconsistent with the prior statement she allegedly made in a phone conversation with Mr. Mogilnicki, such that had Mr. Acree attempted impeachment, it would have been unsuccessful. Ms. Cahill testified that she told Mr. Pole to spend down the budget but not on his own and without checking with her first. *See* Trial Tr. (Jan. 21, 2011), ECF No. 84 at 47:16-21. According to Mr. Mogilnicki in his statement to the FBI, Ms. Cahill told him that she told Mr. Pole "to zero out the budget" but that she did not "approve[] any of [Mr.] Pole's extra bonuses." Ex. 5 to Def.'s Mot., ECF No. 139-5 at 10. Not only does this statement by Ms. Cahill in the FBI's report qualify as "triple hearsay," *see* Gov't's Opp'n, ECF No. 142 at 21; but also, it does not differ substantially from her

testimony during trial, as Ms. Cahill indicated in both
instances that she instructed Mr. Pole to spend down the budget
but not without approval. Thus, the Court does not conclude that
there was an "unnatural" or crucial omission or contradictory
detail in Ms. Cahill's statements on the stand that might lead a
reasonable jury to conclude that her prior statement referenced
in the FBI report was inconsistent with her trial testimony, and
that she was therefore a less credible witness. *See Stock*, 948
F.2d at 1301. As such, there was no value in impeaching Ms.
Cahill in this way, nor could it have established the truth of
Mr. Pole's contention that Ms. Cahill in fact instructed him to
spend the budget down to zero. *See Wright*, 489 F.2d at 1187. Mr.
Pole is therefore incorrect that impeaching Ms. Cahill's
testimony would have substantively "corroborated Mr. Pole's
testimony that he understood it was his responsibility to spend
down the budget and that he did not need [Ms. Cahill's]
permission to award bonuses as part of doing so." Def.'s Objs.,
ECF No. 195 at 41.

Based on this analysis, and Mr. Mogilnicki's and Ms.
Petroshius' consistent testimony to that of Ms. Cahill that Mr.
Pole was not authorized to issue bonuses "on his own" without
their approval, *see, e.g.,* Trial Tr. (Jan. 19, 2011), ECF No. 82
at 8:3-8, 30:19-20; Trial Tr. (Jan. 24, 2011), ECF No. 85 at
4:21-5:7, 40:3-25, 93:12-17; the Court concludes that there is

no reasonable probability that the jury would have reached a different result had Mr. Acree impeached Ms. Cahill's testimony with her alleged statements referenced in the FBI report.[9]

### b. Failure to Impeach Danica Petroshius' Testimony

Mr. Pole next objects to the R. & R.'s conclusions that Mr. Acree was not ineffective for failing to impeach Ms. Petroshius, another former chief of staff, by: (1) calling Ms. Kruse "to impeach Ms. Petroshius' testimony that Mr. Pole needed her approval to issue bonuses; and (2) using a memorandum Mr. Pole sent to [Ms. Petroshius] informing her that the projected surplus was over $200,000 and that there would be money left over[.]" Def.'s Objs., ECF No. 195 at 41. The substance of Mr. Pole's objections to these conclusions raises proper, specific arguments against the R. & R.'s findings, so the Court reviews each of these two arguments de novo. *See* LCvR 72.3(b).

---

[9] In his motion for a new trial, Mr. Pole raises two ineffective assistance of counsel claims regarding Ms. Cahill—that Mr. Acree should have: (1) called her as a defense witness; and (2) impeached her testimony while she was on the stand as a witness for the government. *See* Def.'s Mot., ECF No. 139 at 22-23. Mr. Pole does not challenge Magistrate Judge Faruqui's conclusion that it was "sound trial strategy" to not call Ms. Cahill as a defense witness, so the Court **ADOPTS** that portion of the R. & R. *See* ECF No. 193 at 19.

### i. Failure to Call Kathleen Kruse to Impeach Danica Petroshius

Mr. Pole argues in his motion for a new trial that Mr. Acree should have called Ms. Kruse as an impeachment witness "to demonstrate that she informed [Ms.] Petroshius [that] she had received a bonus of either $15,000 or $17,800, as indicated by a memorandum of her FBI interview the government produced in discovery." Def.'s Mot., ECF No. 139 at 23 (citing Ex. 7 to Def.'s Mot., ECF No. 139-7 at 2-3). He contends that Ms. Kruse's testimony would have impeached Ms. Petroshius "on the critical issue of whether she knew of high year-end bonuses." *Id.* at 23-24. Although the D.C. Circuit concluded, in remanding this "colorable" ineffectiveness claim, that "had [Mr.] Pole's counsel successfully impeached . . . [Ms.] Petroshius, [Mr.] Pole might have undermined [her] testimony that he needed [Ms. Petroshius'] approval before making salary adjustments[,]" *Pole*, 741 F.3d at 127; Magistrate Judge Faruqui rejected this claim because he concluded that impeachment was "immaterial" in this situation, and that Mr. Acree's "decision not to impeach" Ms. Kruse was a "strategic choice . . . entitled to substantial deference[,]" R. & R., ECF No. 193 at 20 (citation and internal quotation marks omitted). For the reasons explained below, the Court agrees with the former but not the latter R. & R.

conclusions, even though it ultimately agrees with Magistrate Judge Faruqui that this ineffectiveness claim must fail.

At trial, Ms. Petroshius testified that all bonuses needed to be approved by the proper "chain-of-command," and that Mr. Pole could not issue bonuses, including exit bonuses, "without getting the approval of the chief of staff." Trial Tr. (Jan. 24, 2011), ECF No. 85 at 98:6-17. During her testimony, Ms. Petroshius was asked about a particular employee of Senator Kennedy's office, Ms. Kruse, and she described how Ms. Kruse's salary had been historically low despite her long tenure, value, and seniority at the office, and how she worked with Ms. Kruse to increase her salary over a period of years to get it "more in line with [that of] other senior staff." *See id.* at 32:24-33:15, 128:2-8. Although Ms. Petroshius was never asked whether she knew if Ms. Kruse had received a "high year-end bonus[]," Def.'s Mot., ECF No. 139 at 23-24; Mr. Pole argues that a memorandum from the FBI's interview with Ms. Kruse could have impeached Ms. Petroshius' testimony, as it states that Ms. Kruse "remembered having one conversation with Danica Petroshius . . . about a big bonus and a raise" that she received in 2003, *see* Ex. 7 to Def.'s Mot., ECF No. 139-7 at 3.

The Court rejects Mr. Pole's argument, as it does not find any inconsistent statements between Ms. Petroshius' testimony and what Ms. Kruse told the FBI regarding her conversation with

Ms. Petroshius. First, contrary to Mr. Pole's claims, the FBI
memorandum does not make it "clear that the bonuses the FBI was
asking" Ms. Kruse about were ones allocated *and* approved by Mr.
Pole, Def.'s Objs., ECF No. 192 at 42-43; as the cited portion
of the report only indicates that Ms. Kruse and Ms. Petroshius
discussed "a big bonus and a raise[,]" Ex. 7 to Def.'s Mot., ECF
No. 139-7 at 3. This aligns with Ms. Petroshius' testimony that
she "sat down with [Ms. Kruse] and worked out" a way for her to
receive "significant [salary] increases to get her more in line
with other senior staff." Trial Tr. (Jan. 24, 2011), ECF No. 85
at 33:12-15. Thus, because Ms. Petroshius never testified that
she did not approve bonuses or salary increases for Ms. Kruse
"over a period of years," *id.* at 33:14; the extrinsic evidence
cannot undermine any testimony from Ms. Petroshius "that she did
not know about bonuses being awarded" from Mr. Pole "that she
had not approved[,]" Def.'s Objs., ECF No. 192 at 42 n.8.

Moreover, "Ms. Petroshius never denied being told about Ms.
Kruse's bonus[.]" ECF No. 193 at 20. In fact, she was never
asked to testify about her knowledge of any specific year-end
bonuses that Ms. Kruse may have been awarded. Therefore, her
testimony does not contradict any proffered testimony from Ms.
Kruse regarding the FBI's report; rather, the report bolsters
Ms. Petroshius' testimony, as it indicates that Mr. Pole told
Ms. Kruse "that he would ask the Chief of Staff for a raise for

[Ms.] Kruse." Ex. 7 to Def.'s Mot., ECF No. 139-7 at 3. Overall, it would not have been feasible for Mr. Acree to use Ms. Kruse to rebut or impeach Ms. Petroshius' testimony regarding: (1) "whether she knew of high year-end bonuses[,]" Def.'s Mot., ECF No. 139 at 23-24; and (2) "that Mr. Pole needed her approval to issue bonuses[,]" Def.'s Objs., ECF No. 195 at 41.

Nor would Ms. Kruse's potential testimony have served any other purpose since it could only be used to impeach Ms. Petroshius and could not be "treated as having any potential substantive or independent testimonial value." *United States v. Livingston*, 661 F.2d 239, 243 (D.C. Cir. 1981). Instead, the Court views Ms. Kruse's testimony as irrelevant because it does not speak to the central issue at trial—whether Mr. Pole reasonably believed he had authority to award bonuses without approval from a higher authority—particularly when none of the charges against Mr. Pole stemmed from any bonus Ms. Kruse may have received. *See United States v. Marshall*, 935 F.2d 1298, 1300 (D.C. Cir. 1991) (requiring impeachment evidence to bear on "a material disputed issue at trial" and be "inconsistent" with the relevant testimony); Gov't's Opp'n, ECF No. 142 at 23.

Accordingly, the Court concludes that Mr. Acree's performance was not deficient, nor was Mr. Pole prejudiced in Mr. Acree's failure to call Ms. Kruse to impeach Ms. Petroshius' testimony. In reaching this conclusion, however, the Court

rejects the R. & R.'s conclusion that Mr. Acree's "decision not to impeach" Ms. Petroshius was "strategic," *see* R. & R., ECF No. 193 at 20; as there is no record evidence that Mr. Acree specifically considered impeaching Ms. Petroshius with Ms. Kruse's testimony related to the FBI's memorandum. Nonetheless, for the reasons stated above, Mr. Pole's ineffective assistance of counsel claim centering on Ms. Kruse must fail because there is no reasonable probability that using her as an impeachment witness would have changed the outcome of his trial.[10]

### ii. Failure to Impeach Danica Petroshius with a Budget Memorandum

Mr. Pole next argues in his motion for a new trial that Mr. Acree should have impeached Ms. Petroshius by questioning her about an undated budget memorandum that she received from Mr. Pole advising her that the office's projected surplus was over $200,000, with "money left over" after "giv[ing] out as much of

---

[10] Mr. Pole repeatedly cites *Smith v. Wainwright*, 799 F.2d 1442, 1444 (11th Cir. 1986) for the contention that "failure to impeach key government witness[es] with prior inconsistent statement[s] [is] prejudicial error." *See* Def.'s Objs., ECF No. 195 at 40-43. However, the Court concludes that *Smith* is inapposite here because: (1) Mr. Pole did not similarly identify inconsistencies between earlier statements allegedly made by Ms. Cahill or Ms. Petroshius and their testimony at trial; and (2) unlike here, in *Smith*, "the only way for the defendant to prevail would have been successfully to impeach" the witness, as his conviction "rested upon" the witness's testimony, so the fact that prior inconsistent statements were not disclosed to the jury was prejudicial error. 799 F.2d at 1444.

[the office's] surplus as bonuses as possible." Def.'s Mot., ECF
No. 139 at 24; Ex. 8 to Def.'s Mot., ECF No. 139-8 at 2-3. He
further informed Ms. Petroshius in the memorandum that "[i]t
would be ideal to decide on dollar amounts and who will be
getting bonuses no later than mid-month[,]" which would
"maximize [his] ability to spend down the money efficiently."
Ex. 8 to Def.'s Mot., ECF No. 139-8 at 2. Mr. Pole contends that
had Mr. Acree sought to impeach Ms. Petroshius' testimony with
this extrinsic evidence, "it would have supported [Mr.] Pole's
defense that he did not conceal spend-down bonuses from the
Chiefs of Staff[.]" Def.'s Mot., ECF No. 139 at 24; Def.'s
Objs., ECF No. 195 at 43. Because the Court has reviewed de novo
Mr. Pole's similar objection regarding Mr. Acree's failure to
use and introduce into evidence unredacted budget memoranda, it
does the same de novo review here.

As with the unredacted budget memoranda, the Court notes
that the central issue at trial was not whether Mr. Pole kept
the chiefs of staff informed about budget surpluses and spend-
down bonuses, but rather whether he reasonably believed he could
spend down the budget by awarding such bonuses without theirs or
the Senator's approval. *See Pole*, 741 F.3d at 127. The Court
agrees with Magistrate Judge Faruqui's finding that this budget
memorandum does "not show that Mr. Pole was authorized to spend
down the budget without [Ms. Petroshius'] approval." R. & R.,

ECF No. 193 at 22; *see also* Gov't's Opp'n, ECF No. 142 at 24
(arguing that this memorandum "contains no evidence that [Mr.]
Pole informed [Ms.] Petroshius about spend-down bonuses he
issued without her approval"). To the contrary, the memorandum
supports the government's position that Mr. Pole lacked
authority to issue bonuses on his own and that he knew so. For
example, Mr. Pole appears to be asking for Ms. Petroshius'
approval in "decid[ing] on dollar amounts and who will be
getting bonuses" from the budget surplus by "no later than mid-
month." Ex. 8 to Def.'s Mot., ECF No. 139-8 at 2. As the
government notes, and the Court agrees, Mr. Pole uses language
throughout the memorandum seemingly acknowledging "that he
<u>cannot</u> single-handedly make decisions about bonuses[,]" Gov't's
Opp'n, ECF No. 142 at 24 (emphasis in original); such as Mr.
Pole "recommend[ing]" that Ms. Petroshius look at historical
bonus patterns in discerning present bonus numbers, asking her
to make "a decision on bonuses by July 15th," requesting that he
and Ms. Petroshius "discuss ways that we may spend down any
additional surplus," and advising her to "be aware" of certain
concerns "if [she was] planning a larger bonus" for certain
employees, Ex. 8 to Def.'s Mot., ECF No. 139-8 at 2-3.

Given the damaging effects this document could have had on
Mr. Pole's good faith defense, the Court concludes that Mr.
Acree's failure to question Ms. Petroshius about this memorandum

as a means of impeachment was not deficient performance, nor
prejudicial to the outcome of the jury's verdict in Mr. Pole's
trial. Instead, the information contained in the memorandum
supports viewing Mr. Acree's decisions to generally deemphasize
the documents in Mr. Pole's case as "strategic" and as a means
of "sound trial strategy." Hearing Tr. (Apr. 7, 2022), ECF No.
188 at 70:7-22; *Strickland*, 466 U.S. at 689.

### c. Failure to Call James McCarthy as a Witness

Finally, Mr. Pole argues in his motion for a new trial that
Mr. Acree should have called Mr. McCarthy, a former co-worker of
Mr. Pole, to testify as a witness since he previously told the
FBI in an interview that he received an $11,000 bonus in 2006
that was processed by Mr. Pole even though Mr. McCarthy "was not
close with [Mr.] Pole and did not consider [Mr.] Pole a friend."
Def.'s Mot., ECF No. 139 at 23; *see* Ex. 6 to Def.'s Mot., ECF
No. 139-6 at 2-3 (explaining to the FBI that Mr. McCarthy "would
have been surprised if [Mr.] Mogilnicki didn't approve [Mr.]
McCarthy's 2006 bonus because [Mr.] Pole would have been the
last person to do [Mr.] McCarthy a favor"). Mr. Pole contends
that Mr. McCarthy would have testified to this effect, which he
argues would have undermined the government's arguments that Mr.
Pole acted in bad faith by only awarding bonuses to himself and
his close friends at the office. Def.'s Mot., ECF No. 139 at 23.

The Court reviews Mr. Pole's objection to the R. & R.'s conclusion that Mr. Acree was not ineffective for not calling Mr. McCarthy as a witness for clear error because Mr. Pole only reiterates his original arguments that Magistrate Judge Faruqui considered and rejected. *Houlahan*, 979 F. Supp. 2d at 88; *compare* Def.'s Mot., ECF No. 139 at 23 (arguing that Mr. McCarthy's "testimony would have severely undermined a central tenet of the government's case, *i.e.*, that [Mr.] Pole only awarded bonuses to his friends at the office"), *with* Def.'s Objs., ECF No. 195 at 44-45 (calling Mr. McCarthy's testimony "crucial evidence" for negating "the government's very theory of this case that [Mr.] Pole allocated bonuses to himself and his friends only" and arguing that "given the centrality of this theory to the government's case[,] . . . failure to call [Mr.] McCarthy was ineffective assistance").

The Court's review of the R. & R. indicates that it mischaracterizes Mr. Acree's testimony from the evidentiary hearing. The R. & R. states that "Mr. Acree concluded that whether Mr. Pole only awarded bonuses to his friends did not affect the legality of the bonus." ECF No. 193 at 17 (citing Hearing Tr. (Apr. 7, 2022), ECF No. 188 at 71-72). However, the cited portion of the evidentiary hearing does not match this statement, and the transcript indicates that Mr. Acree was never specifically asked whether he considered calling Mr. McCarthy as

a witness. Instead, when asked about his "strategy with respect
to which witnesses to call to testify," Mr. Acree responded that
he "take[s] into account the totality of the testimony, not just
the part that [he] want[s] to get out" and that he tries to be
"protective" in anticipating any harmful testimony that might be
elicited on cross-examination. Hearing Tr. (Apr. 7, 2022), ECF
No. 188 at 71:2-16, 72:14-19. Based on that strategy and his
"best judgment," Mr. Acree testified that "it didn't come to
mind for [him] that there [were any] witness[es] beyond the ones
that [he] called that [he] felt comfortable in putting on the
stand." *Id.* at 71:12-22. This reflective statement presumably
extends to Mr. McCarthy, thereby negating Mr. Pole's argument
that Mr. Acree failed to consider calling Mr. McCarthy. *See*
Def.'s Objs., ECF No. 195 at 43-45.

Therefore, despite the R. & R.'s mischaracterization of Mr.
Acree's testimony, the Court agrees with Magistrate Judge
Faruqui that Mr. Acree's testimony supports concluding that he
made "'strategic decision[s]'" regarding which witnesses to
call, decisions which are to be afforded "'great deference'" by
the Court. R. & R., ECF No. 193 at 16-17 (quoting *United States
v. Campbell*, No. 92-cr-0213, 2004 WL 5332322, at *14 (D.D.C.
Sept. 1, 2004) (citing *United States v. Kozinski*, 16 F.3d 795,
813 (7th Cir. 1993)), *aff'd in part, dismissed in part*, 463 F.3d
1 (D.C. Cir. 2006)). And, even if Mr. Acree wholly failed to

investigate Mr. McCarthy as a potential witness, *see Campbell*, 2004 WL 5332322, at *14 ("Failure to interview potential witnesses in the entirety is not a strategy decision . . . and . . . may give rise to a claim for ineffective assistance."); Mr. Pole cannot show that having Mr. McCarthy testify would have produced a different trial result. As the government notes, Mr. McCarthy could not testify to Mr. Pole's view of their relationship, Mr. Pole's beliefs regarding his authority to award bonuses, or even if his bonus was awarded without Mr. Mogilnicki's authorization. *See* Gov't's Opp'n, ECF No. 142 at 22. To the contrary, Mr. McCarthy's statement to the FBI demonstrates his belief that Mr. Mogilnicki was aware of and approved the bonus he received. *See* Ex. 6 to Def.'s Mot., ECF No. 139-6 at 2-3 (telling the FBI that Mr. McCarthy remembered thanking Mr. Mogilnicki for his 2006 bonus and that he "would have been surprised" if Mr. Mogilnicki did not approve his bonus). Thus, it appears likely that Mr. McCarthy's potential testimony would have indicated that his bonus was not an unauthorized action by Mr. Pole, and therefore, it would not have been relevant to whether Mr. Pole reasonably believed he had authority to issue himself and others (friends or not) unapproved bonuses. Accordingly, without any finding of prejudice, the Court denies this ineffectiveness assistance of counsel claim.

Accordingly, because none of the individually alleged actions, or inactions, by Mr. Acree constitute deficient errors that prejudiced the outcome of Mr. Pole's trial, the Court rejects Mr. Pole's argument that Magistrate Judge Faruqui "failed to consider cumulative error." *See* Def.'s Objs., ECF No. 195 at 38-39; Def.'s Mot., ECF No. 139 at 24-25.[11]

### B. Magistrate Judge Faruqui Did Not Err in His Conclusion That the Court's Original Restitution Order Can Be Confirmed

Mr. Pole's final objection is to the R. & R.'s conclusion that the Court's original $75,042.37 restitution order can be confirmed. *Compare* R. & R., ECF No. 193 at 24-26, *with* Def.'s Objs., ECF No. 195 at 45-46. Because Mr. Pole objects to Magistrate Judge Faruqui's determination that caselaw from this circuit related to the calculation of restitution amounts, specifically the D.C. Circuit's decision in *United States v.*

---

[11] Mr. Pole argues that the totality of Mr. Acree's errors caused him "*Strickland* prejudice," especially given "the closeness of this case," which he alleges is exemplified by two notes from the jury during deliberations indicating that they were having "difficulty reaching unanimity on all counts." *See* Def.'s Mot., ECF No. 139 at 24; Def.'s Objs., ECF No. 195 at 14, 32. The Court rejects Mr. Pole's argument, as it does not view the jury's notes as evidence that "there is a reasonable likelihood that [any] additional evidence counsel should have introduced would have led the jury to" rule in his favor. Def.'s Mot., ECF No. 139 at 24; *cf.* Gov't's Opp'n, ECF No. 142 at 25-26 ("The evidence against [Mr.] Pole . . . was so overwhelming that even if [Mr. Acree] had done everything [Mr.] Pole contends he should have done, it would not have made a difference in the outcome."); Govt's Resp., ECF No. 196 at 5.

*Udo*, 795 F.3d 24 (D.C. Cir. 2015), is non-dispositive in the instant case, the Court reviews this objection de novo.

Following sentencing, the Court ordered Mr. Pole to pay the government $75,042.37 in restitution—Mr. Pole's "total gains from all unauthorized bonuses he awarded himself," $77,608.86, "minus the small amount [Mr.] Mogilnicki managed to recover[,]" $2,566.49. *Pole*, 741 F.3d at 124, 127; *see* J., ECF No. 102 at 5. The total amount covered eight unapproved bonuses that Mr. Pole issued to himself every year from 2003 to 2007 until he departed Senator Kennedy's office: $10,720.65 (2003 year-end); $3,000.00 (2003 holiday); $21,253.10 (2004 year-end); $9,007.37 (2004 holiday); $11,678.95 (2005 year-end); $11,526.48 (2005 holiday); $8,026.48 (2006 year-end); and $2,395.83 (2006 holiday). R. & R., ECF No. 193 at 25; Gov't's Opp'n, ECF No. 142 at 29 n.17. Mr. Pole awarded himself all of these bonuses over this period of three and a half years in the same manner—by issuing PAAs to the Senate Disbursing Office to temporarily increase his salary "by more or for longer than authorized by the Chiefs of Staff." Gov't's Opp'n, ECF No. 142 at 30 (citing Gov't's Trial Exs. 11, 32, 39, 51, 53A-53L); R. & R., ECF No. 193 at 24 (citing Gov't's Trial Exs. 53A-53N, 69).

On appeal, Mr. Pole disputed the correct restitution amount. He argued, as he does now, that he should only be required to pay back $11,233.24, "the total gains from five

unauthorized bonuses underlying the counts of conviction minus what [Mr.] Mogilnicki recovered." *Pole*, 741 F.3d at 127; Def.'s Mot., ECF No. 139 at 26 n.7 (arguing that this is "the full amount authorized by the Jury's verdicts"). This argument stems from the fact that although Mr. Pole's indictment "alleged a scheme to defraud dating from July 2003, the five-year statute of limitations prevented the government from charging fraud for wire transfers occurring prior to December 15, 2004." *Pole*, 741 F.3d at 124. As a result, on appeal, the parties primarily debated, "whether, under the Mandatory Victim Restitution Act [("MVRA")], 18 U.S.C. § 3663A, courts can order restitution for all losses resulting from a scheme to defraud, where as here, some of those losses occurred outside the statute of limitations." *Id.* at 127. However, the D.C. Circuit did not reach this question because it concluded that the restitution order was not supported by record evidence indicating that either the jury or this Court had made factual findings to support "a scheme to defraud extending to conduct outside the statute of limitations[.]" *See id.* at 127-28. Accordingly, the D.C. Circuit remanded the restitution order so the Court could make "factual findings regarding the duration of [Mr. Pole's] scheme" to defraud the government that could support the restitution order. *See id.* at 128-29.

Magistrate Judge Faruqui did just that on remand, stating that a court ordering restitution must "articulate a factual basis for its restitution amount by pointing to evidence in the record." R. & R., ECF No. 193 at 24 (citation omitted); *see also Pole*, 741 F.3d at 129 (requiring restitution orders to "rest[] on adequate findings" or "an adequate factual basis"). He cites various government trial exhibits supporting the veracity of the amounts of the eight unapproved bonuses that Mr. Pole awarded to himself between 2003 and 2007, totaling over $77,000. *See* R. & R., ECF No. 193 at 24-25 (citing Gov't's Trial Exs. 53A-53N, the PAA forms Mr. Pole submitted between 2003 and 2007 detailing his salary increases; Gov't's Trial Ex. 69, the government's summary chart of Mr. Pole's unauthorized bonuses between those years). Following a comparison of this record evidence, including testimony from the chiefs of staff that they did not approve these bonuses, to Mr. Pole's indictment, *see id.* at 26 (citing Indictment, ECF No. 1 at 2-10 ¶¶ 9-23); Magistrate Judge Faruqui concluded that the eight improper bonuses were all "part of the [same] scheme to defraud . . . for which Mr. Pole was charged and convicted" and could "form[] the basis for the restitution order." *See id.* at 24-26 (concluding that the $75,042.37 total amount "was attributable to the same underlying [unauthorized bonus] scheme, and the [five] counts of wire fraud on which [Mr. Pole] was convicted" (citation and internal quotation marks

omitted)). Mr. Pole does not object to Magistrate Judge Faruqui's factual findings and instead argues that the R. & R.'s application of the law based on the MVRA to the facts is incorrect. *See* Def.'s Objs., ECF No. 195 at 45-46. Accordingly, the Court adopts the R. & R.'s factual findings regarding the duration of Mr. Pole's scheme and proceeds to analyze whether it also correctly concludes that convictions for "scheme-based offense[s]," like wire fraud, enable an award of restitution for all losses resulting from that scheme, "regardless of whether the defendant is convicted for each criminal act within the scheme[.]" R. & R., ECF No. 193 at 25-26 (citation and internal quotation marks omitted).

Mr. Pole argues that restitution must be limited to the offenses on which he was convicted—the specific wires charged in Counts One through Five—based on: (1) the MVRA, and (2) the D.C. Circuit's decision in *Udo*. *Id.* at 25. For the reasons discussed below, the Court disagrees with both arguments.

### 1. Where a Defendant Is Convicted of a Crime of Which a Scheme to Defraud Is an Element, the MVRA Requires Restitution in the Amount of Total Losses Incurred in the Course of the Scheme, Including Those That Occurred Outside the Statute of Limitations

The MVRA states that a district court "shall order, in addition to, . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18

U.S.C. § 3663A(a)(1). In *Hughey v. United States*, 495 U.S. 411,
110 S. Ct. 1979, 109 L. Ed. 2d 408 (1990), "the Supreme Court
held that where a defendant pleads guilty to a single count,
restitution under the Victims and Witness Protection Act
[("VWPA")] is limited to damage caused by that single count[,]"
*United States v. Emor*, 850 F. Supp. 2d 176, 202 (D.D.C. 2012)
(citing *Hughey*, 495 U.S. at 420); *i.e.*, "the loss caused by the
specific offense that is the basis of the offense of
conviction[,]" *United States v. Pepper*, 51 F.3d 469, 473 (5th
Cir. 1995) (citing *Hughey*, 495 U.S. at 413). However, Congress
subsequently amended the VWPA and included identical changes
when it later enacted the MVRA, *see Emor*, 850 F. Supp. 2d at
202; such that today, "[f]or 'an offense that involves as an
element a scheme, conspiracy, or pattern of criminal activity,'
the MVRA defines a victim entitled to restitution as 'any person
directly harmed by the defendant's criminal conduct in the
course of the scheme, conspiracy, or pattern[,]'" *United States
v. Parnell*, 959 F.3d 537, 539-40 (2d Cir. 2020) (quoting 18
U.S.C. § 3663A(a)(2)). "Wire fraud is such an offense, requiring
a 'scheme or artifice to defraud' as an element of the crime."
*Id.* at 540 (quoting 18 U.S.C. § 1343); *see also Pepper*, 51 F.3d
at 473 (explaining that "a fraudulent scheme is an element" of
the offense of wire fraud). Ultimately, the MVRA requires that
courts order restitution "to each victim in the full amount of

each victim's losses," 18 U.S.C. § 3664(f)(1)(A); which raises the question of whether that includes "all losses resulting from a scheme to defraud, where . . . some of those losses occurred outside the statute of limitations[,]" *Pole*, 741 F.3d at 127.

Several courts of appeal to consider the issue have concluded that "restitution under the MVRA encompasses losses arising from criminal conduct in the course of a scheme, including acts outside the statute-of-limitations period, as long as those losses are attributable to the same underlying scheme, and as long as some part of that scheme for which the defendant was convicted occurred within the statute of limitations." *Parnell*, 959 F.3d at 540; *see also United States v. Ellis*, 938 F.3d 757, 763-65 (6th Cir. 2019) (concluding that the MVRA requires restitution "for all losses attributable to [the defendant]'s scheme to defraud," which in a wire fraud case, includes conduct that was part of the scheme beyond the five-year statute of limitations); *United States v. Anieze-Smith*, 923 F.3d 565, 573 (9th Cir. 2019), *cert. denied sub nom.*, *Garba v. United States*, 140 S. Ct. 613, 205 L. Ed. 2d 403 (2019) (reading the MVRA to conclude that "Congress intended the district court to compensate victims of scheme-based crimes for all losses incurred throughout the entire scheme," which includes "restitution for acts outside the reach of the indictment"); *United States v. Dickerson*, 370 F.3d 1330, 1342

(11th Cir. 2004), *cert. denied*, 543 U.S. 937, 125 S. Ct. 343, 160 L. Ed. 2d 244 (2004) ("[W]here a defendant is convicted of a crime of which a scheme is an element, the district court must, under 18 U.S.C. § 3663A, order the defendant to pay restitution to all victims for the losses they suffered from the defendant's conduct in the course of the scheme, even where such losses were caused by conduct outside of the statute of limitations."); *United States v. Williams*, 356 F. App'x 167, 170 (10th Cir. 2009) (same).[12] Thus, in these circuits, federal courts may order restitution encompassing losses from an entire scheme to defraud so long as the victims' losses are a direct result of the defendant's criminal conduct or are "closely related to the scheme, rather than tangentially linked." *Dickerson*, 370 F.3d at 1342-43 (citation and internal quotation marks omitted); *see also Emor*, 850 F. Supp. 2d at 202-03 (citations omitted).

In line with this caselaw, the Court concludes that "although the statute of limitations may prevent the government from charging [Mr. Pole] for acts that occurred outside the

---

[12] The government also cites several cases in which courts of appeal have upheld restitution orders encompassing total losses from multi-year schemes to defraud that fell partly outside of the statute of limitations. *See* Gov't's Opp'n, ECF No. 142 at 27-28. The R. & R. incorporates many of these cases in support of its conclusion that the MVRA requires restitution for the eight improper bonuses that "were all part of the same scheme for which Mr. Pole was charged and convicted." *See* R. & R., ECF No. 193 at 25-26.

statute of limitations, it poses no bar to imposing restitution
under the MVRA for damages occurring from [his] full scheme."
*Anieze-Smith*, 923 F.3d at 573. The Court therefore concludes
that $75,042.37 is the proper amount of restitution to be paid
by Mr. Pole, who was found guilty of five counts of wire fraud,
which includes as an element "a scheme . . . to defraud." 18
U.S.C. § 1343. As demonstrated by the above factual findings,
the unapproved bonuses that fell outside of the five-year
statute of limitations were directly related to the fraudulent
transfers for which Mr. Pole was charged and convicted, as they
were accomplished in the same manner. $75,042.37 is therefore
"all attributable to the same underlying scheme" that Mr. Pole
conducted from 2003 to 2007 while working in Senator Kennedy's
office and represents "the total amount of losses suffered by
the government over the course of" Mr. Pole's fraudulent
unapproved bonuses scheme. *Parnell*, 959 F.3d at 540-41.

### 2. The D.C. Circuit's Decision in *United States v. Udo* Does Not Bar Restitution in the Full Amount of Mr. Pole's Entire Underlying Scheme to Defraud the U.S. Senate

Lastly, Mr. Pole argues that the above analysis is
incorrect because he contends the D.C. Circuit's decision in
*United States v. Udo*, 795 F.3d 24 (D.C. Cir. 2015) makes "clear"
that "'uncharged relevant conduct' . . . may not be a basis for
restitution." Def.'s Objs., ECF No. 195 at 45 (citing *Udo*, 795

F.3d at 33-34). Magistrate Judge Faruqui rejected this argument
and concluded that "*Udo* is factually distinct" because it
involves "a standalone offense"—preparing false tax returns—
rather than "a scheme-based offense" such as wire fraud, for
which Mr. Pole was convicted. R. & R., ECF No. 193 at 25. The
Court agrees with this conclusion. Mr. Udo was indicted and
convicted of "twenty-five counts of violating [Internal Revenue
Code] § 7206(2), which makes it a felony to '[w]illfully' help a
taxpayer file a materially false tax return." *Udo*, 795 F.3d at
27-28. Although the D.C. Circuit concluded that he could not be
ordered to pay restitution for "uncharged relevant conduct,"
*i.e.*, "the losses generated from more than a dozen other returns
that [Mr.] Udo was not convicted of helping prepare[,]" *id.* at
34; this is not analogous to Mr. Pole's case, as Internal
Revenue Code § 7206(2) does not include as an element a scheme
to defraud like wire fraud does in 18 U.S.C. § 1343. Thus, in
*Udo*, the D.C. Circuit never had an occasion to distinguish
between what Magistrate Judge Faruqui called "a standalone
offense" and "a scheme-based offense" like wire fraud involving
criminal conduct both within and outside of the relevant statute
of limitations. Accordingly, the Court concludes that Mr. Pole's
reliance on *Udo* is misplaced, and that the amount of restitution
that Mr. Pole owes to the government, now supported by factual

findings from the record, is $75,042.37, the total harm caused by his fraudulent scheme.

**V.     Conclusion**

For the foregoing reasons, the Court **ADOPTS IN PART** Magistrate Judge Faruqui's R. & R., *see* ECF No. 193; and **DENIES** Mr. Pole's Motion for a New Trial, *see* ECF No. 139. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

        **Signed:    Emmet G. Sullivan**
                    **United States District Judge**
                    **February 23, 2024**